Gibony v. Foster.

OSCAR GIBONY and LEWIS GIBONY, Appellants, v. MARY E. FOSTER, NANCY C. BANFIELD, JOHN GIBONY and GEORGE GIBONY.

Division Two, July 19, 1910.

1. **WILL CONTEST: Incapacity of Testatrix.** If the testatrix had sufficient understanding to comprehend the nature of the transaction she was engaged in, the nature and extent of her property, and to whom she desired to give it and was giving it, without the aid of any other person, she had sufficient mental capacity to make the will.

2. **——: ——: Old Age: Forgetfulness: Former Wills: Mislocation of Property.** Testatrix was eighty-eight years old, and left an estate of about $25,000, which she had accumulated by her own efforts in the preceding forty years. She had collected her rents regularly, knew when they came due, and always demanded all that was due her, and sometimes more, both in rents or on notes. She had made other wills, one of them ten years previously, and alone brought them to the lawyer's office, clearly pointed out changes she wished to make in them, owing to the fact that she had sold some pieces of property therein specially devised and bought others, and the changes in the devises related to these properties. The will was read over to her, and she directed the lawyer to call in two witnesses, naming them, and at her request they attested her signature, made by her mark, no other persons being present. Her sight was bad and sometimes while in the street she inquired the way to her home; she did not at times recognize old or new acquain-

tances, and once her granddaughter, and her talk was often rambling. In the will she gave a farm to a son, and located it in Greene county, when it was seven miles away in Polk county, and stated therein that the son was residing on it, when in fact he was then in Indian Territory, but the farm had been bought for the son and he arrived in her city two days later. *Held*, that she possessed sufficient capacity to make a will, and the court did not err in peremptorily directing the jury to find for proponents on that issue.

3. ———: ———: **Cheated by Real Estate Agents.** The fact that certain real estate agents sought to take advantage of the aged and infirm testatrix, and succeeded in making bad bargains with her, does not indicate a lack of sufficient mental capacity to make a will.

4. ———: **Undue Influence: Exercise: Burden.** The burden is on contestants to show that the will was the result of undue influence exercised by a daughter upon testatrix; and it must be such influence as dominates the will of testatrix at the time of its execution, such as coercion, or overpersuasion. It is not sufficient to show that the daughter had an undue influence over her mother; it must be shown that she exercised it, and that, as a result of the exercise of that undue influence at the time the will was executed, the will was made.

5. ———: ———: **Attempts: Appropriating Money.** The fact that a daughter proposed to a brother that they combine together to get their mother to make a will giving them the bulk of the estate; that she had informed another brother that a certain man had cheated their mother in a land deal and proposed that they go to him and make him right the wrong, and when the brother said they would take it to court, she objected, saying that would lead to the will being set aside, and then proceeded to tell the brother about the will in suit, and thereafter did nothing towards making the other man settle; that she had borrowed $1500 from her mother and given her note, and that note was found marked paid after testatrix's death; and that she was much with her mother, who collected considerable money, both before and after the will was made, and lived inexpensively, and almost no money was found to be on hand at her death, do not of themselves tend to indicate the exercise by the daughter of any undue influence on testatrix, and the court properly directed a finding peremptorily for proponents on the issue of undue influence.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville*, Judge.

Gibony v. Foster.

AFFIRMED.

*Patterson, Patterson & Delaney* for appellants.

(1)   A will contest is an action at law wherein parties have a right to a trial by jury, and wherein the prerogative of a jury to weigh the evidence (where there is substantial evidence) can no more be usurped than in any other action at law.   The question of the weight of the evidence is for the jury.   In this case there is not only substantial evidence to take the case to the jury, but it is of a character cogent and convincing. .  Young v. Ridenbaugh, 67 Mo. 574; McFadden v. Catron, 138 Mo. 227; State ex rel. v. Guinotte, 156 Mo. 520; Roberts v. Bartlett, 190 Mo. 680; Sayre v. Trustees, 192 Mo. 120; Goodfellow v. Shannon, 197 Mo.271; Archambault v.Blanchard,198 Mo.425; Knapp v. Trust Co., 199 Mo. 640; Schaff v. Peters, 111 Mo. App. 447.   (2)   Where evidence is conflicting as to the capacity of testator it is a question of fact for the jury. Appleby v. Brock, 76 Mo. 314; Aylward v. Briggs, 145 Mo. 604; Moore v. McNulty, 164 Mo. 111; Kirchman v. Scott, 166 Mo. 214; Southworth v. Southworth, 173 Mo. 73.   (3)   The burden was on the proponent to show not only the due execution of the will, herein, but that testatrix had mental capacity.   The burden remained with proponents throughout the case.   Nor is this rule changed by the rule of procedure which declares in effect that proponents make out a prima-facie case by merely proving proper execution and attestation of will, and by merely introducing subscribing witnesses as to sanity.   Cowan v. Shaver, 197 Mo. 203; Goodfellow v. Shannon, 197 Mo. 271.   (4)   Testamentary capacity means that the testatrix, at the time of the execution of the will, had, without the aid of other persons, sufficient understanding and intelligence to transact her ordinary business, and to understand the nature and character of her property and the persons to whom she was giving it, and to appreciate the

claims of the natural objects of affection. By this standard, Mrs. Gibony was not possessed of testamentary capacity. Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248; Farmer v. Farmer, 129 Mo. 534; Roberts v. Bartlett, 190 Mo. 680; Knapp v. Trust Co., 199 Mo. 640; Archambault v. Blanchard, 198 Mo. 384. (5) The question of undue influence should have been submitted to the jury. It is a question for the jury where there is substantial evidence. Young v. Ridenbaugh, 67 Mo. 574. (6) Undue influence need not be shown by direct evidence, but may be inferred from circumstances. Garvin's Admr. v. Williams, 44 Mo. 465; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 297; Dausman v. Ranken, 189 Mo. 677; Bradford v. Blossom, 190 Mo. 110; Roberts v. Bartlett, 190 Mo. 680; King v. Gilson, 191 Mo. 307; Meier v. Ruchter, 197 Mo. 68. (7) While the rule is that the burden of proving undue influence is upon the contestant, yet in this case, owing to the relation subsisting between Nancy Banfield and the testatrix, and the age and condition of health of testatrix, and all the circumstances preceding and surrounding the alleged execution of the alleged will, the concealment following its alleged execution, such a relation of trust is established as to put the burden of proof upon Mrs. Banfield, the chief beneficiary. Roberts v. Bartlett, 190 Mo. 680.

*B. U. Massey, G. A. Watson* and *J. C. West* for respondents.

(1) The will was properly executed, and the court did not err in admitting it. Mays v. Mays, 114 Mo. 536. (2) There being no substantial evidence, either of testamentary incapacity or undue influence, it was the duty of the court so to instruct the jury. Crowson v. Crowson, 172 Mo. 691; Hughes v. Rader, 183 Mo. 630; Wood v. Carpenter, 166 Mo. 465; McFadin v. Catron, 138 Mo. 196. (3) The proof that testatrix failed to recognize her acquaintances at times; that she

lost her way; that she failed to grasp readily the details of her business, falls far short of establishing testamentary incapacity. Southworth v. Southworth, 173 Mo. 72; Hughes v. Rader, 183 Mo. 630; Wood v. Carpenter, 166 Mo. 465. (4) Although testatrix may not have been able to cope with a combination of real estate agents in making a bargain in the two instances mentioned in the testimony, this fact does not tend to establish testamentary incapacity, for a person may be capable of making a will and not be competent to make a contract or manage an estate. Crossan v. Crossan, 169 Mo. 640; Brinkman v. Rueggesick, 71 Mo. 553; Crowson v. Crowson, 172 Mo. 691. (5) The influence denounced by the law must be such as amounts to overpersuasion, coercion or force; destroying the free agency or will power of the testator and substituting the will of another. McFadin v. Catron, 138 Mo. 197. (6) The statements of testatrix as to the conduct of Mrs. Banfield and the statements of Mrs. Banfield, are not competent to show undue influence in the procurement of this will. Techenbrook v. McLaughlin, 209 Mo. 533; Sechert v. Hatcher, 205 Mo. 83.

FOX, J.—This action to contest the will of Sarah A. Gibony, late of Greene county, Missouri, was instituted in the Greene Circuit Court on April 30, 1904. The plaintiff Lewis Gibony and the defendants are children of Sarah A. Gibony; the plaintiff Oscar Gibony is a grandchild of said Sarah A. Gibony.

The petition alleges, first, that at the time Sarah A. Gibony executed the will in contest she was of unsound mind and incapable of comprehending her property and the natural objects of her bounty, and was incompetent to make a will; and, second, that said pretended will was procured by undue influence of Nancy C. Banfield over the testatrix. The answer of the defendants Mary E. Foster, Nancy C. Banfield and

George Gibony was a denial of the allegations of the petition.

The will in contest bears date December 20, 1902. At the time of its execution Mrs. Gibony was eighty-eight years of age. She died January 28, 1904, and the will was admitted to probate by the probate court of Greene county on February 3, 1904. The instrument involved in this contest is as follows:

"I, Sarah A. Gibony, widow, of the city of Springfield, Mo., do make and publish this, my last will and testament, especially revoking the will made by me on the 27th day of April, 1896, and the codicil thereto made July 7, 1902. Since making that will I have, at various times sold and disposed of various parcels of real estate devised therein and as some confusion might arise in construing and adapting that will to the disposition of the property I now have, I hereby revoke that will and any and all wills heretofore made by me.

"First: After all my just debts are paid and after my funeral expenses are settled and paid, it is my will and desire that my property be divided among my children and my grandchild in manner following:

"Second: I give and devise to my daughter, Mary E. Foster, widow, lot number seven in Curtis' Addition to the city of Springfield, Mo., on Campbell street, upon which is erected a two-story brick building, which property I value at $3250.

"Third: I give and devise to my daughter, Nancy C. Banfield, lot number six in Curtis' Addition to the city of Springfield, Mo., on Campbell street, upon which is erected a two-story brick building, which property I value at $3250.

"Fourth: I give and devise to my son, Lewis Gibony, the following described real estate situate in the city of Springfield, Greene county, Mo., viz: the west half of lot number forty in block number ten in M. M. McClure's Addition to the said city of Springfield.

"Fifth: My son, William C. Gibony, has been absent from Greene county, Mo., his former home, for about nineteen years. I have received no word from him in that time and his whereabouts is yet unknown to me. I therefore make no gift, bequest or devise to him. I however, do give and devise to his son, Oscar Gibony, my grandson, the following real estate situate in Greene county, Missouri, *viz*: Lots number fifteen and sixteen, block number one, Kellet's Addition to North Springfield, now Springfield, Mo., to him and to his heirs and assigns forever.

"Sixth: To my son, John Gibony, I give and bequeath the sum of two thousand dollars.

"Seventh: All the rest and residue of my property of whatsoever kind, real, personal and mixed, I desire shall be divided among my three children, Mary E. Foster, Nancy C. Banfield and George Gibony, in manner following: to the amounts which I have placed as the value of lots six and seven in Curtis' Addition, herein devised to my daughters Mary and Nancy, to-wit, $6500, add all the other property of which I may die seized and possessed except said lots and other property hereinbefore in this will devised and bequeathed; then add to this sum the further sum of twenty-eight hundred and fifty dollars which I have advanced to my son George Gibony for the purchase of a farm in Greene county, Mo., which he now owns and occupies—I may mention here that I hold note of said George Gibony for the principal sum of two hundred dollars, which unless paid before my death will be an asset of my estate—I do also hold a note of my daughter Nancy C. Banfield for the principal sum of $1500, which principal will also be a charge against and an asset to that extent, of my estate, if not paid before my death. When these sums of $6500, $2850 and all the rest and residue of my property as aforesaid are aggregated, I will that one-third part of said gross sum be paid to my daughter Mary E. Foster, less the amount

of $3250 the value of the said lot devised to her; one-third part of said gross sum be paid to my daughter Nancy C. Banfield less the amount of $3250 the value of said lot herein devised to her, and one-third part of said gross sum be paid to my son George Gibony, less the sum of $2850, which I have heretofore advanced and paid him to buy his farm as aforesaid.

"Eighth: I hereby appoint my son John Gibony, executor of this will. I request my friends M. V. Ausherman, Charles Stoneman of Springfield, Mo., to sign their names hereto as attesting witnesses to this will and I request Benj. U. Massey, my attorney, to sign my name to this will. I verifying same by my mark as I never could write very well and feel to feeble to write it now, this 20th day of December, 1902.

her

"SARAH A. X GIBONY.

mark.

"By Benj. U. Massey.

"At the request of Mrs. Sarah A. Gibony we have hereto subscribed our names hereto as attesting witnesses to her signature to said will and as witnesses to the signing of her name to said will in her presence and at her request by Benj. U. Massey, this 20th day of December, 1902.

"M. V. Ausherman, residing at Springfield, Mo.

"C. W. Stoneman, residing at Springfield, Mo."

At the time of the making of this will it is estimated that Mrs. Gibony was worth about twenty-five thousand dollars. In the main Mrs. Gibony's property resulted from her active business life. She seems to have been left a widow about the time of the beginning of the Civil War, and she lived near and in Springfield, Missouri, from that time until her death.

Upon the trial a vast amount of evidence was introduced, much of which was irrelevant and had no bearing whatever on the issues involved.

Upon the part of the contestees the subscribing witnesses to the will, M. V. Ausherman and Charles W. Stoneman, as well as the scrivener, Mr. Massey, were introduced. Their testimony in substance was as follows:

M. V. Ausherman testified that he resided in Springfield, and had been engaged in the meat and grocery business on Campbell street for ten years, and was tenant of Mrs. Gibony; that he knew her and that she lived above the property he rented from her, and was living there at the time she executed the will in contest, and had been living there three or four years; that in December, 1902, he was requested to act as a witness to her will, and that she stated that it was her will, and that in his judgment at the time she was capable of making a will; that she signed the will by mark in his presence, and that Mrs. Gibony requested him to sign the will as a witness; that he went to Mrs. Gibony's room at the request of Mr. Massey; that he did not see Mr. Stoneman sign the will; that part of the will was read in his presence by Mr. Massey; that he had frequently seen Mrs. Banfield at Mrs. Gibony's rooms about the time of the making of the will, and thought perhaps she lived there at that time; that he generally paid his rent to Mrs. Gibony, but had paid it to Mrs. Banfield some few times; that when Mrs. Gibony lived on Jefferson street, three or four months prior to her death, he visited her three, four or maybe a half dozen times, and she always recognized him; she had no certain time to collect her rent, but "she never forgot it;" that if she did not come to collect rent the first of the month she came during the month and sometimes he would pay her for two months; she remembered that there were two months due. "She hardly ever made any mistake like that." She remained above my store

about six or seven months after she executed her will. "In the last year that I rented from Mrs. Gibony I paid her my rents, but who came after them, I think different people came after them." After she moved down on Jefferson street "it seems to me she was by herself in a buggy some few times" to collect the rent.

Charles W. Stoneman testified that he was an employee of Mr. Ausherman; that he had known Mrs. Gibony about eight or nine years and that on the 20th of December, 1902, he was requested by her to sign her will; that he did so sign it, and that in his opinion she was capable of making a will at that time; that he did not see Mrs. Gibony sign the will, but she told him that she had signed it by her mark.

Benjamin U. Massey testified that he had taken the will down to the testatrix and asked her who she desired to witness it; "she said that those two gentlemen, Mr. Ausherman and Mr. Stoneman, knew her very well and that they were right there convenient and asked me to step down and ask them to come up." That Mr. Ausherman came up first and Mrs. Gibony stated to him that it was her will; that at that time her mark had not yet been made to the will; witness made the mark to the will, testatrix touching the pen in the presence of Mr. Ausherman; witness read over the entire will to her in the presence of Ausherman; that Ausherman went back to his store and sent Mr. Stoneman up and testatrix stated to him that it was her will; that she had made the mark there, and requested him to sign it as a witness. On cross-examination witness stated: "I took memorandums of what she wanted to make in her will, and those were altered from time to time until she finally had it as she thought she wanted it," that these memoranda were furnished him by Mrs. Gibony at his office; that the preparation of the will did not occupy two separate days; no one was with her at the time. "In the first place, I had written and she had executed two wills; one of them antedated this

will some ten years, I think, and one of them some two or three years. These memoranda referred to the will she last made, and codicil, and she has changed the property that she had. She had sold a piece and bought another, and sold a piece and bought another, and in the original will she had executed codicils in which she stated that she gave this piece to this child, and I have sold that piece, and I intend to give this new piece I purchased, etc.  .  .  .  The only thing that I did, as I tell you, she came with this original will that was there, before me, and she said 'I want this change made in it,' and 'I made a pencil memorandum of that as to the change,' then she would make another change; the memorandum was made for my own information; I then read it to her from time to time as amended; these conversations took place in my office; no one was with her; the last time she came Mrs. Banfield came with her to the office; but she left as soon as the testatrix got in the office; on this visit I took the last memorandum concerning this will; the will was framed in my office and was read to her as it is now, complete."

On the part of the contestants thirty-two witnesses in number were introduced, and their testimony is quite voluminous.

Some of the witnesses testified that about the time of the making of the will in contest Mrs. Gibony's mental condition was such that on four or five occasions she failed to recognize lifelong acquaintances and friends and people whom she had occasion to see often, and that when engaged in conversation at times she would jump from one subject to another. In July, 1902, on the occasion of the visit to her home by Mr. and Mrs. Hicks the testatrix called Mrs. Hicks "Nan Banfield," and when corrected said, "Oh, yes, I recollect you now very well," and "in just a short while she was back on Nancy Banfield again; the whole talk was running toward Nan Banfield; at times she seemed to know pretty well what she was doing, but at other times she didn't

know anything; she said she could not get her mind together at all." Testatrix told Mr. and Mrs. Hicks that she believed her mental and physical trouble was due to living too close to the roof.

In the matter of collecting rents Mrs. Gibony in three or four instances made demands on her tenants for rents before the rents were due and after they had been paid.

Testatrix bought property from one Henry Flora in the fall of 1901; she forgot that Flora reserved a month's rent when he sold her the building and demanded rent for that time; Flora and one Stannard, a real estate agent, undertook to sell this property to Mrs. Gibony for $2000, but Mr. Flora says "she didn't seem to take hold as well as we expected her to and then we put it down to $1850." Witness Flora related a conversation with Mrs. Gibony wherein she stated that her daughter Nancy Banfield was getting along better than any of her children; that she owned a third interest in the Brighton Mill; owned a good farm on Robberson Prairie, and that she had brick buildings in Highlandville, with big glass fronts in the basement. Witness stated that the first two above mentioned properties had been disposed of and that Mrs. Banfield never owned brick buildings in Highlandville. Witness Flora also testified that in 1902 a deal was on foot whereby one Tyler sought to take advantage of Mrs. Gibony by trading a farm worth three or four hundred dollars for business property on Campbell street worth between twenty-five hundred and three thousand dollars, and in order to put through this deal it was proposed on the part of Tyler to give Mrs. Banfield a thousand dollars to get her mother to make the trade, which he understood was to go to Mrs. Banfield; that Mrs. Banfield made two or three trips to discuss the matter with Tyler; that on account of the death of Mrs. Banfield's husband the matter was dropped. On cross-examination this witness admitted that he de-

liberately swindled the testatrix out of $1.50 in putting in four window lights; that he accepted two dollars for the work when he agreed with her to put them in for fifty cents; that he entered into a collusion with Stannard, the agent of Mrs. Gibony, to get $400 more out of her than the property sold testatrix was worth; that he thought she was feeble-minded because he imposed upon her to that extent.

Testatrix frequently sent money to Mr. Ausherman which he deposited for her in the bank; in 1902 Mr. Ausherman being absent from the store, testatrix sent for Mr. Baxter, an employee of Mr. Ausherman, and entrusted $35 to him to be delivered to Mr. Ausherman; afterwards testatrix claimed the sum entrusted Baxter was $60; in a few days she apologized to the witness, saying that "she had gotten it mixed up in her mind." Witness Baxter testified that the testatrix was absent-minded, caused by impaired health and old age.

In 1902 testatrix rented a room adjoining her apartments to a Mr. McClanahan and wife, and afterwards agreed to accept the services of Mrs. McClanahan as a cook in lieu of rent; Mrs. McClanahan testified that she rendered the service during the month following this agreement, but that the testatrix demanded rent for that month.

Charles Bigbee testified that he borrowed money from the testatrix in February, 1903; that he wanted fifty dollars but that Mrs. Gibony only had thirty dollars that day; that he gave testatrix a note for that amount and called two or three different times to pay the note, but that Mrs. Gibony did not remember having made the loan, and that she hardly knew him; that Lewis Gibony afterwards found the note and he paid him; this witness testified that his conclusion was that she wasn't really competent to attend to her own business.

Mrs. Gibony's eyesight was not good, and on two or three occasions in traveling about the street entered a store where she intended to enter the door next to it; that in looking for a barber shop she passed by it. In 1902 she was afflicted with an ailment of her arm that her doctor pronounced eczema. Her son Lewis testified that she had been afflicted with this ailment off and on for a number of years; she told some people this ailment was caused by a spider bite; others, that it was produced by a lye scald. In settlement with Dr. Woody, she told the physician that he had visited her three times; while Dr. Woody testified that he thought he had been there seven or eight times; the doctor said that he just let her have her way about it; that he supposed the old lady was so weak in her body that it affected her mind, that he had known her well for ten or twelve years, and that probably two months after having dismissed her, she having stated that she was so near well she would not need further treatment, he met her on the street; she didn't seem to know him; that he asked her about her arm and her reply was "it is about well, but I would just have died if it hadn't been for Dr. Fulbright." The testimony discloses that Dr. Knighter and Dr. Fulbright both treated the testatrix after she was treated by Dr. Woody. On cross-examination Dr. Woody testified that her mind appeared to be as good as any woman's of her age.

Some four or five witnesses testified that Mrs. Gibony stated a number of times that "she didn't have sense enough or mind enough to manage her own business." Some of the witnesses introduced on the part of the contestants gave it as their opinion, based upon some experience they had had with the testatrix, that that was a fact, while others testified that at times her mind was good; that she transacted business with them and others; that her mind was as good as any woman's of her age. Mrs. Gibony made some two or three real estate deals during the last two or three

years of her life, in all of which she was defrauded by unscrupulous real estate agents.

Tom Cretcher, an acquaintance of testatrix for twelve or fourteen years, testified that about three years prior to the trial (the trial having been had in 1905) he secured an option from testatrix on a lot, paying $25 for the option, the purchase price of the lot being $600; that having failed to sell the lot during the life of the option he requested a renewal for another six months; Mrs. Gibony refused, saying that she didn't want to tie up the property for another six months; that after making the second request for a renewal and also talking to John Gibony about it, it was not until after he got Mr. Stannard to talk to the testatrix that he secured a renewal. Witness Cretcher valued this lot at $1000; this lot was afterwards traded to McClain Jones. This witness also stated that six months or a year before the testatrix died she sent for witness to attend to some business for her. On cross-examination this witness stated that on the occasion of the securing of this option and at the time it was extended he saw nothing in her actions which indicated that she was incompetent to attend to business, and that her actions were nothing else than an ordinarily prudent business person's would be.

Mr. Stevens, who was connected with the Springfield Seed Company and a tenant of Mrs. Gibony, testified that in the latter part of 1902 or the early part of 1903 he had a conversation with testatrix wherein she offered to loan him $1000, saying, "take it and put it in your business; take it at four or five per cent;" witness stated to her that he didn't want to ask anybody to sign his note, whereupon Mrs. Gibony stated, "you won't have to ask them." When asked by the witness why she wanted to loan her money, testatrix replied, "They will get it; I want to put it somewhere where they won't get it." This witness stated that testatrix "seemed to me at times that she was all right

when I would see her and talk with her, and at other times she seemed off.'' Witness further stated that at the time Mrs. Gibony offered to loan him the money he had only known her about a year and a half and that he supposed he was worth one thousand dollars at that time, but didn't suppose testatrix knew his financial condition. On cross-examination witness stated that during the time he occupied the house of Mrs. Gibony, with one or two exceptions, he had paid his rent to her; that she was able to count the rent money and that she always kept her accounts straight.

Mr. Blanton, a real estate agent, testified that early in 1902 he called at the apartments of Mrs. Gibony by request of Mrs. Banfield, she having stated to him that they were thinking of buying a farm for a brother in Indian Territory, or that they were going to make a deal among themselves; when witness called and explained his business Mrs. Gibony told him that Mrs. Banfield was out somewhere and that she did not know much about that; that Mrs. Banfield attended to everything for her and that he would have to see her; requested the witness to call back later and maybe he could see her; when witness returned to the home of Mrs. Gibony an hour later, Mrs. Gibony did not remember him and asked him his name three times, "so I just passed the matter off and thought I would see Mrs. Banfield later.'' Witness gave it as his opinion that she was pretty frail and not capable of talking any business and he didn't bother her for that reason, and that he didn't consider her of sound mind.

Witness Adams testified that in 1902 Mrs. Banfield negotiated the purchase of a farm in Polk county for her mother, the consideration for which was $2250, but that the consideration specified in the deed was $2850. The witness did not remember the conversation that took place between Mrs. Banfield and him at the time except ''that she had something to say about a brother who was a dissipated man; I think she

said he was to get the farm; and something was said about an estate." Mrs. Gibony in her will refers to this farm as being the one for which she paid $2850; states that it is located in Greene county, Missouri, and that it was then occupied by her son George Gibony, for whose benefit its purchase was intended, when as a matter of fact George Gibony had been a resident of Indian Territory for a great many years, returning to Springfield two days after the execution of the will. This farm was located in the adjoining county of Polk and about seven miles from the county line.

Witness Fender testified that when he traded Mrs. Banfield a one-third interest in the Brighton Mill for a farm in 1897 "she lacked something over $1100 of the necessary consideration," and "she remarked that she thought she might get the money from her mother; that she might not do it then, but she thought she could when she caught her just right; she was satisfied she would get it after awhile. Witness further stated that Mrs. Banfield in 1903 stated to him that her mother was just like a child, or "her mind was just like a child's."

Mrs. Petty testified that in June or July, 1902, she went to visit Mrs. Gibony, stating that Mrs. Banfield had asked her to come up and see how she was; that Mrs. Gibony's reply was, "I wish Nancy would let me alone, she is aggravating me to death. She is running after me every day trying to get me up to Massey's office to fix my papers and business, and my business is fixed just as I want it, but I guess though they will just keep on until they aggravate me to death." This witness further stated that "the fact is that anybody knows that Mrs. Gibony's mind was as weak as a five-year old child's; anybody who knew her any length of time in 1902 knew she had no mind."

Mrs. Calvey testified that when she suggested to Mrs. Gibony that she ought to go live with her daughter, the testatrix replied, "All they want me for is my

money.   My daughter got $1500 from me to put in a mill; if she don't pay me that money back I will sure keep her out of her share of the estate." This witness stated that she observed from the conduct of testatrix that she was of unsound mind, but in conversation with her she didn't act childish; they visited each other; the last time witness saw testatrix was a year or two before she died.

Mrs. Hall testified that in a conversation with Mrs. Gibony in 1900 she told her about Mrs. Banfield coming to her home to borrow money to redeem her mill; that her note was due and she asked her for it; that testatrix told Mrs. Banfield she could not let her have it; that Mrs. Banfield and testatrix slept together and during that night Mrs. Banfield commenced crying and she (testatrix) said she just thought she would let her have the money.   Mrs. Gibony told me, "I tell you Mrs. Banfield has got all or about all she will ever get."

Mr. Gott testified that in 1900 he met testatrix on the street one day a short distance from her home and she asked him the way home.   This witness states that "the woman being that close to home and didn't know the way home, it wouldn't look to me like her mind was very good, if you want my opinion." Notwithstanding this witness testified that when Mrs. Gibony requested him to direct her to her home she recognized him and called him by name.

Miss Shumacker, who occupied a room in the apartments of Mrs. Gibony for a period of two years ending in August, 1901, testified that during that time she suggested to Mrs. Banfield that she ought to take care of her mother and that Mrs. Banfield replied, "Carrie, you know mother is weak-minded and you know mother ain't capable of doing her work or taking care of herself; she likes you better than anyone else; take care of her and make it out of the estate." That Mrs. Gibony told the witness that Mrs. Ban-

field never came, only when she wanted money; but whether she got money the witness did not know; that the testatrix never let any of her tenants escape; that "her only craziness was in demanding more rent than was due;" that Mrs. Gibony didn't seem to rely upon Mrs. Banfield at all about the management of her business and that she never heard Mrs. Gibony say anything about Mrs. Banfield advising her about her business; that all of the children of the testatrix visit-ed her and that her treatment of all of them was about the same, although Mrs. Banfield visited her mother more than the other children.

In the year 1900 Mrs. Gibony loaned $800 to her granddaughter's husband, John F. Putnam, taking therefor a note due in 1903, bearing eight per cent in-terest, secured by a deed of trust; Mrs. Putnam testi-fied that when the interest was paid on this note in November, 1902, she and her husband told the testa-trix they expected to pay the note when it became due; that Mrs. Gibony replied, "Well, now you don't both-er yourself or put yourself to any trouble about it; when that note becomes due if I am living I will never bother you, and if I am not living your pa is the admin-istrator, and you will deal with him and he will never bother you; that they were unable to pay the note when it became due and that on December 2, 1903, they re-ceived a letter from Mrs. Gibony requesting the pay-ment of $550. This letter was admitted to have been written by Mrs. Banfield. On December 8th following, the Putnams called at the home of Mrs. Banfield; that Mrs. Gibony did not recognize them until her son John, father of Mrs. Putnam, stepped in; that Mrs. Gibony couldn't tell them what she wanted with the money; that Mrs. Banfield remarked, "You know, mother, you want to fix Mary's house with it." Mr. Putnam re-marked, "Well, grandma, I am in a hurry, and haven't got time to fool with you anyway; I have got the money and will just pay you off." When asked by

the Putnams if she would "shave the note if they paid all off," Mrs. Gibony replied, "No, I will not; nobody ever shaves any notes for me, not a bit of it;" that upon the suggestion by Mrs. Banfield that, "Ma, you can knock off the interest from the time it was due until now on the amount," testatrix said, "Yes, I can do that," and the note and interest were then paid.

Aaron Hicks, Walter Gibony and Lewis Gibony testified that after the death of the father-in-law of Mrs. Banfield, who left Mr. Banfield a legacy of one dollar, they heard Mrs. Banfield say she had been left in one will, but she was going to see about the next one.

Mr. Hicks testified that from February, 1902, until August he visited the testatrix every two weeks; that at times she seemed to be conscious of everything and as capable of attending to business as she ever was "and may be the next words were clearly entirely off." On cross-examination Mr. Hicks testified that he borrowed three dollars from the testatrix in 1900 and paid it back in June, 1902, and that testatrix insisted that it was $5 he borrowed and that he paid her $5. Witness said testatrix didn't recollect it, because her mind was gone.

Mrs. Roberts testified that in a conversation with Mrs. Banfield in 1897 Mrs. Banfield told her that her mother's mind was very bad, and in 1904 she stated that her mother's mind was good until her death.

John T. Gibony testified that late in the fall of 1902 he complained to his mother about the way her abstracts and title papers were scattered about over the room, and that she stated these were not worth anything, because she had the deeds to the property. He also stated that shortly prior thereto he paid all her taxes on her real and personal property, and that she complained because he had paid taxes on her personal property, saying that she never had paid personal taxes in her life, whereas, the witness stated, she had always paid personal taxes. In this same conversation

this witness stated that his mother told him that she had loaned $2850 to Nancy Banfield, without any security whatever, and she stated that she kept coming around her and kept bothering her and that she was telling him that so that he might be able to hold his own with her in case she "dropped out," but, "She says she will pay it. I swore her, I swore her." The witness said, "You swore her, how did you swear her?" Her reply was, "I put my hand on her shoulder this way and I made her hold her hands. She swore before me and my God that she would pay me what she owed me." This witness further stated that in a conversation with his mother in July, 1903, wherein the matter of purchasing a lot for burial purposes was discussed and after mentioning a number of cemeteries, his mother authorized him to purchase a lot, but asked if she could not purchase an acre lot for $5, when the witness stated that land was worth $60 an acre in that neighborhood. "She told me she wanted to be buried so that Mary Foster could be put by her in the center of the west half of the lot." That his mother rented a portion of her apartments over Ausherman's store to a colored family; but she caused them to move when objections were made by other tenants. That Mrs. Banfield moved to Springfield in 1901, and that his mother moved to Mrs. Banfield's home in July, 1903; that Mrs. Banfield was a frequent visitor at his mother's home during the last two or three years of his mother's life and that his mother told him that "she eternally came there after money all the time." That his mother recognized that she had made an unfortunate trade with McLain Jones, and that on December 23, 1903, Mrs. Banfield said to the witness: "John, McLain Jones has swindled mother out of that lot down there on the Jordan, we ought to go to him and make him pay us three or four hundred dollars more;" the witness replied, "We will do no such thing. If he has swindled her out of it, we will go to the courts, and have things

corrected," and that his sister said, "Lord of Mercy, that won't do. It will break mother's will." John said, "How will that have anything to do with breaking a will made ten years ago?" She said, "Well, she's made a new will." John said, "When did she make it?" She wouldn't tell when she made it and went on to tell how the will was made. She said, "Mary and me get this house here [meaning the business property over which her mother lived], and George gets the farm in Polk county and his note for two hundred dollars; you get two thousand dollars, and if it hadn't been for me you wouldn't have gotten but a thousand dollars. I made mother add another thousand to yours, and I made her give Lewis that property up on Lincoln street, that house and lot." John said, "What did Oscar get?" "Well," she said, "Oscar gets two houses in north town." The witness said, "Then what?" She just brought her hands together like this (indicating) and said, "Mary, George and me take the rest," and then when Mrs. Banfield found the McLain Jones matter would have to go to court she took no further interest in it. That in 1903 he asked his mother about Mrs. Banfield's $1500 note, and that when she told him that she had let Mrs. Banfield have it "to show to the pension authorities" he complained to his mother that she would keep it, and that when he took charge of the estate Mrs. Banfield's note was marked paid and that she claimed it for services rendered in taking care of her mother; and that the $2850 was paid off. This $1500 note the evidence discloses was marked paid in full on August 31, 1903, signed by Mrs. Gibony, and attested by two witnesses. Witness further stated that in 1899 his mother's property was worth over $22,000; her income was about $1500; that his mother lived cheaply and that when he took charge of the estate it only had $446.05 in money; that when Mrs. Banfield came to Springfield his mother had $6000 in the bank and on the 4th of December, 1903, less than two

months before his mother's death, John Putnam paid his mother eight hundred and sixty-four dollars; that George Gibony returned from the Territory on the 22d of December, 1902; that from what his mother told him of a former will she left Mrs. Banfield and Mrs. Foster the same real estate as is devised to them under the will in contest, and that such former will was a fair division of her property except as to Lewis and Oscar; that he was left property under the former will valued at $3550, while the will in contest leaves him $2000 in cash. While this witness states on direct examination that he requested that he be made a plaintiff in this suit and declined to act as executor, on cross-examination he states that when the suit was brought he was proceeding to execute the will and the court ordered the estate into the hands of an administrator; he further stated on cross-examination that in 1866 the feeling between him and his mother was not good, and that he at one time jerked her off of a horse, but that since that time the feeling existing between them was good. While on direct examination he stated that his mother's mind began to fail in 1900, on cross-examination he admitted that she managed her own business until 1902, and stated that his mother's "mind just come and went," and that she had as good a mind as anybody of her age; and the only matter of influence which he knew of Nancy Banfield having over his mother was that Nancy Banfield told him that she made her do certain things in regard to her will.

Lewis Gibony testified that his mother's mind was not very weak; that after Mrs. Banfield moved to Springfield she said to him, "Lewis, you know the condition mother's mind is in, and I can see it quicker than you can who is with her all the time; that woman won't live six months. Now, John Gibony has had $2500 on this Dolin Park property; Sister Mary is old and old-fashioned, and never had nothing nohow; never had a decent coat unless mother bought it for her, and

if she had anything she wouldn't know what to do with it, and George Gibony has been down in the Territory ever since 1874; has been away so long we don't care much for him, now let's me and you go in together and get the bulk of this estate," and that his reply was, "I went to hell for one brother and ruined my life, now I can't afford to turn around and rob my brothers and sisters." That sometime prior to 1900 his mother loaned $700 to Jeff Dillon, and in 1901 he borrowed $50 more; that Dillon paid the $50 note in 1902 and that his mother thought this payment should be credited on the $700 note, but on his advice she returned the $50 note to the maker; that at one time Mr. Van Buren said to him, "Lewis, that damned rascal Stannard is up there again, and you know the condition of your mother's mind; you go up and look after him." That the property given him under the will was worth more than $1000. On cross-examination this witness stated that he had served a seven-year term in the penitentiary at Little Rock for the crime of perjury; but that he was convicted in an attempt to save his brother; that his mother requested him to do so; that his brother William was also convicted of a like offense, sent to the penitentiary and escaped, and has been a fugitive ever since, and that he supposed he was dead; that his mother gave him very little money because she said it was an injury to him because he would spend it for drink; that he had had some trouble with Mrs. Banfield and that she had had him arrested for it.

According to the testimony of another witness the property left to Oscar Gibony under the will was about $800.

At the close of the testimony on the part of the contestants the court, at the request of the proponents, directed the jury to return a verdict finding that the

230 Sup—9

will in contest was the last will and testament of Sarah A. Gibony, deceased.

A timely motion for new trial was filed and by the court overruled. Judgment was entered of record in favor of the defendants and from this judgment plaintiffs prosecuted this appeal, and the record is now before us for consideration.

## OPINION.

We have indicated in the statement of this cause substantially the nature and character of the testimony presented to the court. Upon the state of facts as disclosed by the record we are confronted with two legal propositions.

First: Did the testatrix have sufficient mental capacity to execute the will in controversy, and was there sufficient testimony upon that subject to authorize the court to submit the cause to the jury?

Second: Was the will of the testatrix executed in the form in which it is now presented through or by undue influence exercised over her by her daughter, Nancy Banfield, or anyone else, and was there sufficient testimony to authorize the submission of that question to the jury?

## I.

Directing our attention to the question of the mental capacity of the testatrix, Mrs. Sarah A. Gibony, it is well to keep in mind the proper standard of mental capacity to sustain a will. In Sayre v. Trustees of Princeton University, 192 Mo. l. c. 120, GANTT, J., in speaking for this court, very clearly stated that "the standard of mental capacity required to sustain a will has been fixed so far as judicial utterances can settle a principle, and it is that the testator must have 'had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he desired to give

it, and was giving it, without the aid of any other person,' '' citing, in support of such announcement, Crossan v. Crossan, 169 Mo. 641; Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248.

In Sehr v. Lindemann, 153 Mo. l. c. 288, it was expressly ruled that upon making out a prima-facie case by the proponents of the will, it then devolved upon the contestants to establish incompetency or undue influence. This court in responding to the proposition confronting it in that case, said: ''By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. . . . Mere opinions of witnesses that the testator was 'childish,' or acted 'funny' or was 'worse than a child,' or that there were 'inequalities in the will,' unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' ''

This court in a long and unbroken line of decisions has unqualifiedly approved the test of capacity as indicated in the foregoing cases. [Riley v. Sherwood, 144 Mo. 354; Berberet v. Berberet, 131 Mo. 399; Defoe v. Defoe, 144 Mo. 458; McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry County, 145 Mo. 432; Aylward v. Briggs, 145 Mo. 604; Hughes v. Rader, 183 Mo. 630; Sayre v. Trustees of Princeton University, 192 Mo. 95.]

As before stated we have indicated substantially the nature and character of the testimony upon which

this cause was submitted to the court, and applying the facts as disclosed by the record to the test of mental capacity as indicated in the cases herein referred to, we see no escape from the conclusion that Mrs. Gibony was possessed, at the time of the execution of her will, of sufficient mental capacity to execute such an instrument. The testimony in Hughes v. Rader, 183 Mo. 630; Sayre v. Trustees of Princeton University, 192 Mo. 95, and Winn v. Grier, 217 Mo. 420, presented, if anything, much stronger cases for submission to the jury than the case at bar, yet this court after reviewing all the testimony held that there was no substantial evidence upon which the contestants had a right to go to the jury. What was said in Hughes v. Rader, supra, regarding the mental capacity of the testatrix to dispose of her property may very appropriately be repeated as applicable to this cause. It was there said: "It is true she was weak and in feeble health and her mind not as strong and vigorous as when in perfect condition; but this furnishes no test as to capacity to execute the instrument. If the testimony in this cause is to be regarded as sufficient to authorize the annulment of this will, on the ground of incompetency, then we confess it in effect precludes the exercise of the right of disposition of property by all those who undertake to exercise it at a time when they are unfortunately overtaken by ill health. The mere expressions by the many witnesses that her mind was weak, that she did not look right since she was injured, and that her mind was affected, cannot be made the basis for support of a finding that she was mentally incapacitated to execute her will. The expressions of this court in Riley v. Sherwood, supra, may very appropriately be applied to this case; it was there said: 'We are not unmindful of the sweeping expressions that the testatrix was "childish," and forgetful; that she was more feeble mentally than she had been in her more robust womanhood before she had suffered from her broken

Gibony v. Foster.

hip. In all this mass of testimony there is no evidence that she was incapable of transacting ordinary business, or was ignorant of her estate or the objects of her bounty. The mere statement that as she advanced in years her mind was not so vigorous as in her young womanhood imparts no information as to her want of capacity to dispose of her property. As was said in McFadin v. Catron, 138 Mo. 197, "Such indefinite generalities will not suffice." The law exacts something more definite and tangible than such assertions to overcome the judgment of the disinterested business men and neighbors who transacted business with this testatrix up to the time of her death without once questioning her ability to transact her business in an intelligent manner. "Opinion" evidence is very unsatisfactory at best, but when the facts upon which it is predicated disclose that it is without any reasonable foundation, it has no probative force.' "

In Crowson v. Crowson, 172 Mo. l. c. 702, BURGESS, J., had under consideration the question as to the mental capacity of Mr. Crowson to execute a will. There were in that case, as in the case at bar, many witnesses who testified that the testator was of feeble mind and was not at the time of executing the will capable of transacting business matters. In the treatment of the testimony of that character Judge BURGESS very clearly stated the rule as applicable to it. He said: "The only statements of these witnesses which have any bearing whatever upon this feature of the case are to the effect that the testator 'was not at the time of executing the will capable of transacting business matters.' These statements were mere opinions of non-experts without a single fact upon which to predicate them. There was no attempt by the testator to transact any business at that time other than to make his will, and his directions with respect thereto to Mr. Beaven who wrote it showed that he had a clear perception of what he was doing, and what disposition

he was making of his property. The expert testimony did not help the contestant's case. Besides, a man may be capable of making a will and yet be incapable of making a contract or managing his estate. [Brinkman v. Rueggesick, 71 Mo. 556; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Crossan v. Crossan, 169 Mo. 631.]"

Directing our attention to the testimony applicable to the mental capacity of Mrs. Gibony, we are unable to recall any case where a stronger prima-facie showing was made by the proponents than in the case at bar. Mr. Massey, who drafted the will, testified very clearly that Mrs. Gibony had made two former wills and that there were certain changes she wanted to make; that she very intelligently directed him as to the changes she wanted made, and he made notes before drafting the present will upon the margins of the former wills; there was no one present aiding her in the disposition of her property, she was with Mr. Massey alone and directed him in a clear and intelligent way as to how she desired to dispose of her property; when the time arrived for the execution of the will she directed that the two witnesses, Mr. Ausherman and Mr. Stoneman, whom she knew very well, and called by name, be requested to come up and witness the execution of her last will and testament. We have very carefully analyzed all of the testimony introduced by the contestants, and in our opinion there is an entire absence of sufficient testimony to in any way contradict the prima-facie case as made out by the proponents of the will. Mrs. Gibony was eighty-eight years old; it was but natural that her eyesight should have failed as well as her memory, and the mere fact that she failed at times to recognize people or that she would make some mistakes in a business transaction, and that her mind seemed, by reason of her old age, to be somewhat weakened, falls far short of furnishing such substantial testimony as to her mental capacity as to

authorize the submission of that question to the jury.
While it is true that in the will she made the mistake
of locating a certain farm in Greene county when it
should have been located in Polk county, and that she
stated in the will that her son George was residing
upon the farm, yet this mistake, as applicable to the
question of mental capacity, is very trivial, in view of
the fact that the farm was in an adjoining county to
Greene and had in fact been purchased for George,
and he reached home within two days after the execu-
tion of the. will. It must not be overlooked that she
knew she had the farm to dispose of, and emphasizing
the fact that she knew what property she had to dis-
pose of she never claimed any amount from anybody
less than what was in fact coming to her. The record
discloses that upon the settlement of a note when the
parties were insisting that she should "shave it," the
testatrix replied, "No, I will not; nobody ever shaves
any notes for me." Dr. Woody testified that she was
physically weak and that that had an influence upon
her mental condition; however, he stated upon cross-
examination that her mind was about as good as any
woman's of her age.

We have carefully considered in detail all of the.
testimony bearing upon the question of the mental
capacity of Mrs. Gibony to execute this will, and in our
opinion she fully meets the test of the cases hereto-
fore indicated, and as was said in Hughes v. Rader,
supra, "If the testimony in this cause is to be re-
garded as sufficient to authorize the annulment of this
will, on the ground of incompetency, then we confess
it in effect precludes the exercise of the right of dis-
position of property by all those who undertake to ex-
ercise it at a time when they are unfortunately over-
taken by ill health." While it may be true that certain
real estate agents sought to take advantage of Mrs.
Gibony in some real estate deals, and succeeded in
making bargains with her that were disadvantageous

to her interest, this can in no way effect the result of this controversy, and by no means indicates a want of mental capacity to execute a will, for it frequently occurs that advantages of a similar character are taken of persons much younger than Mrs. Gibony and much more sprightly.

It is sufficient to say upon this proposition that after a most careful consideration of all the testimony applicable to it we are thoroughly convinced that Mrs. Gibony had sufficient mental capacity to execute the will in controversy.

## II.

This brings us to the consideration of the final contention of learned counsel for appellant that the execution of this will was the result of undue influence exercised over the testatrix by her daughter, Mrs. Banfield. We have carefully considered the testimony as disclosed by the record applicable to this proposition, and in our opinion there is an entire absence of any substantial testimony showing that this will as executed by the testatrix was by any undue influence of Mrs. Banfield or anyone else.

It is fundamental that the burden of proving that the will was the result of undue influence is upon the party alleging it. [Carl v. Gabel, 120 Mo. 283.] Numerous witnesses testified in this cause as to what Mrs. Banfield said she was going to do and had done in the way of getting her mother to dispose of her property. That really was nothing more than hearsay testimony. There is absolutely no showing that she did anything to influence her mother to make the will in the form in which it is presented in this contest. It must be remembered that Mrs. Banfield was the daughter of Mrs. Gibony, and the influence which might result from affection by reason of the relationship existing between the parties is not such undue influence as would authorize the annulment of a will. As before

stated the burden was upon the contestants in this cause to show undue influence, coercion, or overpersuasion, or fraud and deceit in the procurement of the execution of the will. Undue influence as contemplated by law, as was announced by Burgess, J., in Crowson v. Crowson, 172 Mo. l. c. 702, must be such influence as dominates the will of the testator at the time of its execution. In other words that the will was not in fact his own will but that of the party who was exercising the undue influence. [McFadin v. Catron, 120 Mo. 252.] It may be that Mrs. Banfield as the daughter of Mrs. Gibony had an undue influence over her, but it is fundamental that it is not the existence of undue influence, but the exercise of it in the execution of the will which invalidates such will.

In Williams on Executors (7 Am. Ed.), vol. 1, p. 58, it is said: "It must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; further, there must be proof that the act was obtained by coercion; by importunity which could not be resisted; that it was done merely for the sake of peace; so that the motive was tantamount to force or fear."

In Boyse v. Rossborough, 6 House of Lords 6, the subject of undue influence received full consideration, and Lord Chancellor Cranworth, as the result of that examination and deliberation, said: "In a popular sense we often speak of a person exercising undue influence over another, when the influence certainly is not of a nature which would invalidate a will. . . . In order, therefore, to have something to guide us in our inquiries on this very difficult subject, I am prepared to say that influence, in order to be undue within the meaning of any rule of law which would make it sufficient to vitiate a will, must be an influence exercised either by coercion or by fraud. In the interpreta-

tion, indeed, of these words, some latitude must be allowed.''

It was held by this court in Jackson v. Hardin, 83 Mo. 185, that ''the influence denounced by law must be such as amounts to over-persuasion, coercion or force, destroying the free agency and will power of the testator. It must not be merely the influence of affection or attachment, nor the desire of gratifying the wishes of one beloved, respected, and trusted by the testator.'' [Rankin v. Rankin, 61 Mo. 295.]

We see no necessity for pursuing this subject further. We have carefully examined and considered in detail all the testimony disclosed by the record applicable to the subject of undue influence, and in our opinion there is an entire absence of any such testimony as would authorize the trial court in submitting that question to the jury.

Entertaining these views the action of the trial court in directing the jury to return a verdict finding that the will in controversy was the last will and testament of Mrs. Gibony, was entirely proper, and the judgment of the trial court should be affirmed, and it is so ordered. All concur.