## JOSEPHINE BENSBERG et al. v. WASHINGTON UNIVERSITY et al., Appellants.

### Division One, June 28, 1913.

1. **WILL CONTEST: Burden of Proof: Prima-facie Case.** The burden is upon the proponents of a will to show that the testator was of sound mind, and such proof is a requisite of their prima-facie case, although they may be aided therein by proof introduced by contestants.

2. ————: **Testamentary Capacity: Chronic Alcoholism: Delusions.** *Held,* that there was evidence tending to prove that testator was, when he made his will, suffering from delusions caused by chronic alcoholism, and the issue of testamentary capacity was for the jury.

Appeal from St. Louis City Circuit Court.—*Hon. Virgil Rule,* Judge.

AFFIRMED.

*Eliot, Chaplin, Blayney & Bedal,* for appellant, Washington University.

(1) Where an issue of fact is raised and the testimony in support of said issue is all on one side and uncontradicted, still the question must be referred to the jury, who are the triers of fact and who must pass upon the credibility of the witnesses. Dalton v. Poplar Bluff, 173 Mo. 39; Printz v. Miller, 135 S. W. 19;

Gordon v. Burriss, 141 Mo. 602. However, there is authority to the contrary, that where the evidence is undisputed, is one way, and is of such brand of cogency that but one just conclusion can be drawn, the court may deal with it as a matter of law. Cornovski v. Transit Co., 207 Mo. 273; Howard v. Hurst, 131 S. W. 1. (2) Where an issue is raised in a will contest on the execution of the will, and the testimony pertaining to the execution was uncontradicted, the court declined to pass upon the question in one case as to whether the trial court could properly have directed the verdict of the jury on that issue. Gordon v. Burriss, 141 Mo. 602. The practice of so doing has been followed, and approved, however. Schierbaum v. Schemme, 156 Mo. 1; Southworth v. Southworth, 173 Mo. 59; Teckenbrock v. McLaughlin, 209 Mo. 533; Beyer v. Schlenker, 131 S. W. 465. (3) Whatever the correct rule may be, there is no occasion to leave the question for decision to the jury where, during the trial, the issue is waived and the facts of execution are admitted. Gordon v. Burriss, 141 Mo. 615; Monroe v. Railroad, 135 S. W. 1016. (4) When one of the witnesses to a will is dead, proof of the execution of said will is made by evidence of the handwriting of the testator and of the deceased witness, and of such other circumstances as would be sufficient to prove such will on a trial at common law. R. S. 1909, sec. 552. (5) The attestation of a subscribing witness to a document may be used when the attester is unavailable as evidence of the document's execution, and the attesting signature need not be accompanied by an attestation clause. The fact of attestation is a testimonial assertion that all of the facts required to be done pertaining to the execution have been done. 1 Wigmore on Evidence, secs. 1505-1514. (6) Nor can contestants raise the point that there is no proof that the deceased attesting witness signed in the presence

of the testator, since they in fact admit such to have been the fact when they admit that said deceased witness was an attesting witness. (7) The legal test of the requisite mental capacity to make a valid will is measured by the following rule: One must have capacity to comprehend all of his property and all of the persons who reasonably come within the range of his bounty, and have sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property. Holton v. Cochran, 208 Mo. 410. (8) Proof of delusions or hallucinations entertained by a.testator is no evidence of lack of testamentary capacity unless such delusions or hallucinations relate to his property and the will itself is a direct result of partial insanity or monomania indicated by such delusion or hallucination. Benoist v. Murrin, 58 Mo. 307.

*Rassieur, Kammerer & Rassieur* and *Schnurmacher & Rassieur* for respondents.

(1) Where there is an issue as to whether the will was properly executed and attested, the burden rests upon the proponents to establish due execution, and even though there is no countervailing testimony, the question must be submitted to the jury. It is the province of the jury to pass on the credibility of the witnesses. Gordon v. Burris, 141 Mo. 602; Cowan v. Shaver, 197 Mo. 203; Dalton v. Poplar Bluff, 173 Mo. 39; Prince v. Miller, 135 S. W. 196. (2) If at the time of the execution of the will the testator did not have sufficient mental capacity to understand what he was doing, or to comprehend the nature, extent or value of his property, or who would be the natural objects of his bounty, then he did not have mental capacity sufficient to make a will. Crum v. Crum, 231 Mo. 626. (3) Where a new trial is sought on the ground of newly discovered evidence, and such evidence is very

material, and not merely cumulative, and the party seeking the new trial was not guilty of laches in the matter, a new trial should be granted.    Investment Co. v. Hoyt, 164 Mo. 140.

BROWN, C.—This suit was brought May 15, 1907, in the circuit court for the city of St. Louis, to contest the will of Charles Seitz, who died in that city, February 1, 1907.    The petition is as follows:

**Will Contest.**

"Josephine Bensberg and Laura Seitz, Plaintiffs,

vs.

Washington University, a Corporation, German General Protestant Orphans Home, a Corporation, Missouri Historical Society, a Corporation, and Wm. J. Murray and the St. Louis Union Trust Company, a Corporation, Executors of the Last Will of Charles, Seitz, Deceased, Defendants.

"Plaintiffs aver that at the times hereinafter referred to the defendant. Washington University was and is a corporation, duly incorporated under the laws of Missouri; the defendant German General Protestant Orphans Home was and is a corporation, duly organized under said laws; the defendant Missouri Historical Society was and is a corporation duly organized under the said laws, and the defendant St. Louis Union Trust Company was and is a corporation duly organized under said laws.

"Plaintiffs further allege that they are the only children and sole heirs-at-law of Charles Seitz, late of the city of St. Louis aforesaid, who departed this life on the 1st day of February, 1907.    That after the death of said Charles Seitz, deceased, to-wit, on February 5, 1907, an instrument in writing, bearing date the 31st day of May, 1905, purporting to be the last will and testament of said Charles Seitz, but which was not, in fact, his last will, was presented to the probate court of the city of St. Louis for probate by the de-

fendants and alleged by them to be the last will and testament of said Charles Seitz and said instrument was by said probate court on said day duly admitted to probate.

"That said instrument is in words and figures as follows, to-wit:

" 'I, Charles Seitz, of the city of St. Louis, State of Missouri, of sound mind and memory, do make, declare and publish this, my last will and testament, hereby revoking all other wills and testaments heretofore made by me.

" 'After the payment of my just debts and funeral expenses, I give, devise and bequeath to the German General Protestant Orphans' Society of No. 4447 Natural Bridge Road of the city of St. Louis, one thousand dollars ($1000); Missouri Historical Society, No. 1600 Lucas Place, of the city of St. Louis, one thousand dollars ($1000), and the balance of my estate of which I may die seized, possessed or entitled, whether real, personal or mixed, wheresoever situated and whatever nature, in equal parts, share and share alike, in fee simple, absolute to my two children Josephine and Laura Seitz, and in case of the death of either of my two children without heirs of their body, to the Washington University of the city of St. Louis. I direct and require that any and all real estate held by anyone in trust for me shall be at once conveyed and transferred to my aforesaid children in absolute.

" 'I appoint herewith my friend William J. Murray and the St. Louis Union Trust Co. of the city of St. Louis to execute my last will and testament.

" 'In witness whereof I have hereunto set my hand and affixed my seal this 31st day of May, 1905.

"Charles Seitz.  (Seal)

" 'The above and foregoing instrument of writing was this 31st day of May, 1905, signed, sealed by the above named Charles Seitz as and for his last will and testament in our presence of each of us who at

his request and in his presence have hereunto set our names as attesting witnesses thereof.

" 'JOHN RUECKERT,

" 'CHRIST A. STADLER.

" 'It is further my wish and desire that after my demise I be buried beside the remains of my dear mother in Bellefontaine Cemetery of St. Louis, being lot No. 4413 of said cemetery.

" 'Also that a suitable monument to be placed on said lot not to exceed the cost of five thousand dollars.

" 'CHARLES SEITZ.'

"That the original of said pretended will is on file among the records of said probate court. That said Charles Seitz was at the time of his demise possessed of a large amount of real estate in the City of St. Louis of the value of about forty-five thousand dollars, having an annual rental value of about four thousand dollars, and of personal estate of the value of about sixty thousand dollars, all of which, excepting one thousand dollars given to the defendant German General Protestant Orphans Home under the name 'German General Protestant Orphans Society of No. 4447 Natural Bridge Road of the City of St. Louis' and one thousand dollars given to the defendant Missouri Historical Society, was by said alleged will intended to be wrongfully devised and bequeathed to said defendant Washington University in case either of the children aforesaid of said Charles Seitz (the plaintiffs herein) died without leaving children of her body.

"Plaintiffs further state that defendants Wm. J. Murray and the St. Louis Union Trust Company, who were named as executors in said pretended will, have duly qualified as such thereunder and letters testamentary were issued to them by said probate court and they are now acting as such executors and have

taken possession of said estate in the execution of said pretended will and are now in charge thereof.

"Plaintiffs further state that said instrument purporting to be the last will and testament of said Charles Seitz was not and is not the free act and deed of said Charles Seitz and was not and is not his last will and testament; that said pretended will is absolutely null and void, by reason of the following facts, which plaintiffs allege, to-wit:

"1st. That said instrument was not executed by said Charles Seitz as his last will, or by any person by his direction and in his presence and that the same was not attested as and for his last will by at least two competent witnesses, subscribing their names to the said instrument in the presence of said Charles Seitz and in the presence each of the other.

"2nd. That said Charles Seitz was not, on or about the 31st day of May, 1905, the date when said instrument purports to have been signed, and was not for many years prior thereto, of sound and disposing mind; that about fifteen years before his death he began to be affected by alcoholic dementia, caused by excessive indulgence in alcoholic stimulants, which generally impaired his health of body and mind thereafter and up to the time of his death; that he continued such excessive use of alcoholic stimulants from time to time and thereby still further weakened both mind and body; that in consequence of his said physical and mental disease, said Seitz, at said date, to-wit, May 31, 1905, and for a long time prior thereto, had been so weak and infirm in body and mind that he was unable to attend to his ordinary affairs and was wholly dependent upon others for the management of the same, and by reason of his physical and mental condition the mind of said Charles Seitz was affected to such an extent that he was at no time entirely rational, and that he had not on the 31st day of May, 1905, the date when said alleged will is

said to have been executed, sufficient mental capacity to comprehend and understand the property he then possessed nor the persons who were the natural objects of his bounty, nor could he understand the meaning or effect of said paper which purports to be a will, nor what disposition was thereby made of his property, nor its effect upon these plaintiffs, who were his sole heirs at law.

"Wherefore, plaintiffs allege that said instrument above referred to, purporting to be the last will and testament of said Charles Seitz, deceased, is not his last will and testament, and they therefore pray that said instrument be adjudged and decreed to be absolutely null and void, and that, to that end, an issue be made up whether or not said writing produced and admitted to probate as aforesaid be the last will and testament of said Charles Seitz, deceased, and plaintiffs further pray judgment against said defendants for their costs and for such other relief as may be meet and proper in the premises."

The defendant Orphans Home filed answer, but withdrew it before the trial and let judgment go against it *nihil dicit*. The other defendants answered putting in issue the allegations of the petition and propounding the will. At the trial the defendants introduced Mr. Christopher A. Stadler, one of the witnesses to the will, who testified that he was a collector for the Murray-Hayden Realty Company and had been for seven years, and that during that time he had known Mr. Charles Seitz, who had a desk in the office of the company, and that he saw him from three to four times a day. As collector for the company he collected rents from buildings that Mr. Seitz was interested in. On May 31, 1905, the witness came in, and was told by Mr. Rueckert, the bookkeeper, who was staying in the front office, that Mr. Seitz desired to see him. He went back to the rear, and found him sitting at his desk. He had the will pre-

pared in his own handwriting, and signed by himself
at the bottom of the body of the will on the first sheet,
while the name of Mr. John Rueckert, the bookkeeper,
appeared signed to the attestation at the bottom of
the same sheet in his own handwriting. The witness,
at Mr. Seitz's request, took the pen of the latter and
signed his name under that of Mr. Rueckert. On the
next sheet was written the paragraph relating to the
testator's burial and monument and signed by Mr.
Seitz. At the time Mr. Seitz asked the witness to
sign the paper he stated that it was his will. The
following questions were then asked the witness by
defendants and answered.

"Q. I will ask you what was the mental condi-
tion of Charles Seitz at the time he requested you to
sign this paper as his will and you signed it? A. He
had been drinking prior to that day.

"Q. Just answer the question. What was his
mental condition? A. He looked all right to me.
He looked as though he was able to transact business."

He stated on cross-examination that he did not
see either the testator or Mr. Rueckert sign the will
and that Mr. Rueckert said nothing about it. He
merely said that Mr. Seitz desired to see him. Wit-
ness did not see the part written on the second sheet.
He said that sometimes Mr. Seitz would be absent
from his place of business for days or a week, at
which times he would usually be on a drunk. This
would occur two or three times a year and last from
three to four weeks, during which time he was of a
wandering disposition. He would wander. His mem-
ory seemed wandering. He would see things that did
not exist, point to people about to break into his safe
when there were no people and would say do you see
those men at my .fe. These things would happen
before he would get into the hospital. When he asked
witness to sign the will his eyes looked glassy but
he looked all right. There were often times when he

was not right when witness thought he was. On the day before the signing of the will he was drinking and left the office. He afterward went to Mullanphy Hospital. On the day the witness signed the will his eyes were glassy and he looked as though he might have been wandering at the time, but still there were often times when he looked that way. The witness was a warm friend of Mr. Seitz and had been for years before he died. He did not do much business himself. All he did was to make entries in his ledger, and carried his liquor like a man. When under the influence of liquor you could notice it a great deal in his talk. He was more loquacious then and would keep on at one subject for hours at a time. After introducing evidence of the handwriting of Rueckert as a witness the defendants rested.

The evidence presented by the contestants tended to show that the testator during his lifetime had accumulated considerable property, consisting of St. Louis real estate and investment securities. He had been married, and the two plaintiffs, Mrs. Bensberg, who was married to Mr. Arthur Bensberg in 1900 and has since been known by that name, and Miss Laura Seitz, were the children of the marriage and are his sole heirs. Mrs. Seitz obtained a divorce from him in 1883, when she executed to him a release of her right and interest in all his property, present and prospective. Although of limited education he was a great reader of historical works and was a member of the Missouri Historical Society and the St. Louis Mercantile Library. He had been a bookkeeper and accountant, and was a fine penman. This is indicated by the will itself which was written by him, and is an excellent specimen of penmanship. His alcoholic history furnishes the principal material for this case. It comes into the record in 1893, when he came as a patient to St. Vincent Asylum for the Insane suffering from "acute alcoholism" or "de-

lirium tremens,'' and remained about a week, during which he was treated for that disease. He came again to the same institution several times in 1894 afflicted with the same trouble, and again several times in 1895. During the most of March and April, 1897, he was in the same institution suffering from delirium tremens and alcoholic dementia with hallucinations. It is explained in the evidence that alcoholism is a disease brought on by the excessive use of alcohol; that it is progressive, and repeated attacks bring about the inevitable result of delirium tremens and that delirium tremens brings about dementia which is a form taken or result produced by chronic alcoholism. The acute attacks are characterized by hallucinations and delusions, and weakening of the powers, physical, mental and moral. The hallucinations passed away but the delusions continued. In the language of an expert witness, ''One attack of delirium tremens impairs the mental faculties. Subsequent attacks begin a progressive impairment of these mental faculties; not only the mental faculties, but the moral and the physical energies.'' After the first attack the patient is not normal. The mental, physical and moral impairment is progressive; ''constantly weakening, constantly deteriorating.'' Hallucinations are tricks of the senses. One may see in delirium tremens spiders, serpents or bugs where there are no such things. Delusions are false beliefs, as when one believes that another is his enemy or that he is pursued by persons who are trying to do him harm, or that he is the object of persecution or is being poisoned. The hallucinations pass away but the delusions remain.

Among the delusions attributed in the evidence to Mr. Seitz was that he was persecuted—that he had no friends, or that they were trying to do him up, or get his money. A physician who had known him for fifteen years, and was called in consultation during

the attack from which he died, stated that he had been afflicted with chronic alcoholism during the whole time he had known him; that this is a definite disease progressive in its nature; that repeated attacks led to chronic alcoholism, the inevitable result of which is dementia.    Mr. William J. Murray, president of the Murray-Hayden Realty Company where Mr. Seitz had his desk, and an executor named in the will, testified that when. Mr. Seitz had been drinking hard for a week or ten days he would have him put in Mullanphy Hospital, to which his patronage in that respect seems from the evidence to have been transferred from St. Vincent; that he started in drinking about the first week in May, 1905; that he saw him drunk on the 30th of that month and saw him at the office on the 31st, the date the will was made, bloated from drink, but noticed nothing unusual in his conduct.    That he had his tickets and was to sail for Europe on June 3rd, but the witness had them changed to June 17th and had Seitz put in the hospital on June 10th and taken out on the 16th. He was not then in a fit condition to sail, and his tickets were changed to the 24th, and he sailed on that day.    This witness stated positively that his condition was bad and that he was of unsound mind at the time of and prior to the making of the will.

Dr. Hermann, who had been in charge of the St. Vincent Hospital as medical superintendent ever since 1891, testified that he was called in consultation by Mr. Murray and saw Mr. Seitz at the Mullanphy Hospital before his death; that he died at that time of chronic alcoholism from which he had suffered to witness' knowledge from the year 1893 to the date of his death, that in his opinion the condition of his mind was progressively worse, progressively deteriorating during all that time and up to the time of his death, and that he did not think that on May 31, 1905, the time when he made the will, that he had sufficient

mind to apprehend what he was about to do, nor the property he was about to dispose of, the parties to whom he was giving it and the relation they sustained to him, nor to remember exactly what his duties were towards his relations and the property that he gave.

At the close of the evidence the court instructed the jury to find that the paper writing propounded was the last will and testament of Charles Seitz; to which the contestants duly excepted. The jury returned a verdict accordingly. The contestants thereupon filed in due time their motion for a new trial, complaining, among other things, of the action of the court in giving the peremptory instruction.

They also filed in due time an amendment or supplemental motion for a new trial on the ground of newly discovered evidence, accompanied by affidavits of diligence and the affidavit of Edmund G. Murray, the newly discovered witness, stating that on the morning of May 31, 1905, he came to the office and found Mr. Seitz engaged in writing the will by copying from another paper. That he thought there was a man in the front part of the office trying to get into his safe, and witness, to allay his fears, closed the partition door. He then showed the witness the will and asked him to sign it, which the witness refused because he did not think Seitz knew what he was about. He afterward saw both Rueckert and Stadler sign it. This motion was sustained by the court in the following order.

"Now, at this day the court having duly considered plaintiff's motion for a new trial heretofore filed and submitted herein, doth order that said motion be and the same is hereby sustained for the reason that the court erred in its instruction to the jury and that the verdict and judgment entered herein on December 13, 1907, be and the same is hereby set aside and for naught held."

The defendants duly excepted and have taken their appeal from this order.

The important question in this case is whether or not the court did right in determining, by its order granting a new trial, that the testamentary capacity of the testator should have been submitted to the jury. In the foregoing statement such facts have been taken from the mass of the testimony before the court as are peculiarly applicable to such an inquiry.

It has been the policy of the laws of this State as well as of the common law wherever it prevails, to permit, to the fullest extent consistent with the public welfare, the testamentary disposition of property. While the privilege has been subjected to limitations like those imposed between husband and wife. the testator may, in the absence of any such wholesome restriction, disinherit whom he will, without regard to the moral obligations or restraints arising from ties of blood or the dictates of common humanity, (Meier v. Buchter, 197 Mo. 68), although we have recognized these sentiments as incident to the normal mental equipment, and their absence as some evidence of mental unsoundness. [Mowry v. Norman, 223 Mo 463, 471, and authorities cited.]

Notwithstanding this liberal policy the Legislature of this State has fully appreciated the correlative right of the individual, in the performance of this last act, to be protected not only against those who may be dissatisfied with the disposition which his conscience and affections have dictated, but also against disease, which sometimes perverts the moral sense, and transforms love and healthy solicitude into dislike, suspicion and distrust. To this end our statutes of descents, distributions and dower make what the sentiment of the whole people has determined to be a just disposition of the property of intestates and provide that testimony relating to the validity of wills shall be pointed out upon the same paper whereon

they are written; and they are denied effect until it shall have been publicly proven not only that the testator signed, but "that he was of sound mind" at the time of doing so (R. S. 1909, sec. 551). This proof is to be made by the witnesses to the will if they are available (Id., sec. 553); if not, then by other evidence sufficient to prove the will in a trial at law. If, after this formal proof shall have been made, any person interested shall contest the validity of the will, an issue is to be made up whether the writing be the will of the testator or not, which shall, if either party require it, be tried by a jury.

The statutes to which we have referred speak definitely as to the burden of proof, and this court has insisted upon a literal compliance with its requirements. As was said through GRAVES, J., in Mowry v. Norman, supra: "The burden is upon the proponent of the will, or the defendant in this case, to show the mental capacity of the party making the will, and so long and so recently has this doctrine been announced that citation of authority is not called for." That this burden includes proof of the fact that the testator "was of sound mind" is a statutory rule. The courts are charged with its enforcement in the manner pointed out by the statute, which requires a trial by jury, whenever, in the time and manner prescribed, it shall be required by any person interested. In such a case it is the verdict of the jury which establishes or rejects the will (Gordon v. Burris, 141 Mo. 602.) In that case the court said: "Ordinarily the formal judgment of the court upon the verdict of a jury is necessary to establish conclusively the fact tried, but this statute makes the verdict of the jury, upon the issue tried, final and conclusive. By the verdict the jury finds the paper writing produced to be the will of Lucinda Burris, and this verdict is entered upon the records of the court. We are of opinion that the record entry is

*Burden of Proof.*

sufficient in form to constitute a formal establishment of the will."

As we have already seen the statute requires that the issue submitted to the jury shall be "whether the writing produced be the will of the testator or not," and that upon this issue the burden lies upon the pro- ponent of the will. He must establish not only the execution of the will but the mental capacity of the testator. [Bradford v. Blossom, 207 Mo. 177, 228, and cases cited.] He is "required to prove every affirmative fact that is essential to the execution of a valid will, even though the contestants offer no evi- dence at all. . . . The ultimate question in the case is, is this the last will and testament of the al- leged testator? and the affirmative of that issue is on the proponents." [Bradford v. Blossom, supra, l. c. 229, quoting Cowan v. Shaver, 197 Mo. l. c. 212.] The institution of the contest supersedes the formal proof of the will in the probate court, so that upon the issue prescribed by the statute, the court should take the proof upon which the jury is to establish or reject the will, and the contestants cannot take a voluntary non- suit or dismissal. [Bradford v. Blossom, supra, l. c. 228, and cases cited.] If the defendant fails to sus- tain the burden so imposed upon him it becomes the duty of the trial court to direct a verdict rejecting the will. [Bradford v. Blossom, supra, l. c. 231.]

It has however been uniformly held by this court that when the proponents of the will have made a prima facie case it devolves upon the contest- ant to overthrow it by evidence. [Tecken- brock v. McLaughlin, 209 Mo. 533, 539; Gibony v. Foster, 230 Mo. 106, 131; Sehr v. Lindemann, 153 Mo. 276, 288.] Reverting to the statute by which this proceeding was created, we find that it clearly indicates the evidence that shall constitute a prima facie case for the proponent. Section 551 (R. S. 1909) prescribes the substance of the testimony to

Prima-
Facie
Case.

be given by the witnesses to the will in no uncertain language.  They are to make oath or affirmation that the testator signed the writing as his last will, or that some other person signed it by his direction, in his presence, and *that he was of sound mind*.  The following section provides that when one of the witnesses to the will shall be examined and the others are dead, as in this case, then such proof shall be taken of the handwriting of the testator and of the dead witness *and of such other circumstances as would be sufficient to prove such will on a trial at common law*.  The evident theory of this statute is that the testimony of the witnesses to the will of the facts stated is sufficient to make a prima-facie case establishing it, and that if only one of the witnesses be available, his testimony to the same facts must be taken and *other* evidence introduced sufficient to establish the will in a trial at common law.  In any event it must be shown that the testator was of sound mind.  Judged by this standard, the defendants, when they closed their evidence, were far from having made a prima facie case. The will, it is true, was shown to be in the handwriting of the testator as was also the signature of the one of the two witnesses who was dead, but the only living witness to its execution failed and seemed unwilling to testify that he believed the testator to have been of sound mind at the time of its execution, and no other evidence bearing upon that question had been introduced.  The contestants, however, instead of taking advantage of that circumstance, introduced much evidence bearing upon the testamentary capacity of the testator, and exhibiting his mental condition during a number of years preceding the execution of the will, and up to the time of his death twenty months later.  The evidence must now be considered together, and unless, in this history, there is some evidence substantially tending to show incapacity, it

251 Mo.—42.

is evident that the burden resting upon the proponents has, with the help of the contestants, been sustained. If there is such evidence then the court did right in holding that the case should have been submitted to the jury.

It has been long settled in this State that imperfect memory resulting from sickness or old age, forgetfulness of the names of persons one has known, idle questions, requiring a repetition of information, personal eccentricities and oddities are not evidence of such mental disease and deterioration as render one incapable of making testamentary disposition of his property. [Southworth v. Southworth, 173 Mo. 59, 72; Winn v. Grier, 217 Mo. 420, 446; Gibony v. Foster, supra, l. c. 131.] They are incidents of human life, character and temperament which indicate no abnormal condition. They are the characteristics which distinguish one individual from another or mark the progress of human life from the cradle to the grave. It is true that it sometimes happens during the somatic life of the individual that degeneration affecting the mental activities may have reached such a stage that the mind becomes unreliable and useless as an aid to the possible activities that remain, and then common humanity suggests protection from dangers which must necessarily attend acts proceeding from impulses, either external or internal, uncontrolled and unadvised by reason. To blaze the line between responsibility and irresponsibility in this respect has long been a subject of consideration on the part of the courts. This line is a crooked one at best, being deflected here and there by the character of the act under consideration, whether it be the making of a will, which, when it takes effect closes the book of responsibilities and affections which for him constitute the category of life, a mere business transaction by which he may gain or lose, or an act which, when dictated by intent may constitute a crime involving his life or liberty;

by the marks of the struggle between reason and decay, in which either may have temporarily gained control at the instant of the performance of the given act; and by many other things which the courts have discussed from time to time as they have had occasion. Throughout this discussion runs the thread of laudable purpose to fairly divide the judicial responsibility between judge and jury. This court, speaking by LAMM, J., in Turner v. Anderson, 236 Mo. 523, 544, formulated its conclusion as follows: "To have a mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one."

To understand the natural objects of one's bounty, their deserts, their capacity and their necessities,

Delusions.

one must necessarily be able to contemplate them with a mental and moral vision undistorted by any disease which substitutes in their stead the grotesque phantoms of a disordered imagination. We know that under the compelling influence of insane delusion the loving mother sometimes becomes the slayer of her own children. She is able to recognize their identity to the deadly end, but no one would be so absurd as to say that she recognized their deserts or her own obligations with respect to them; or that she would be more competent to consider their interests in the subjects of her will than in their lives. This idea is expressed with great clearness in 1 Wharton & Stille's Medical Jurisprudence, sec. 67, where it

is said: "The test of testamentary capacity supported by a great majority of cases . . . is whether the testator had capacity to understand the nature of the business in which he was engaged, and ability to recollect and comprehend the condition of the property he wished to dispose of, and understand and decide upon the method of such distribution, and knowledge, memory, and capacity to comprehend his relation to the persons who were or might naturally be the objects of his bounty, and the relative merits of their claims, and was capable of making a rational selection among them according to his settled purpose." In the next following section of the same work the author says: "Delusion has been held to be the true and only test of the presence or absence of insanity, delusion and insanity being regarded as almost, if not entirely, convertible terms. But an exception to the delusion test exists in cases of dementia or loss of mind and intellect." Mr. Locke, in his famous Treatise concerning the Human Understanding (Book 2, Ch. 11, sec. 15) classifies these two kinds of mental unsoundness as madness and folly, and states his conclusion as follows: "In short, herein seems to be the difference between idiots and madmen; that madmen put wrong ideas together, and so make wrong propositions, but argue and reason rightly from them; but idiots make very few or no propositions, and reason scarce at all." In the opinion of the court in the matter of Forman's will, 54 Barb. 274, it is said: "I repeat, that by the reported cases, and by the books, delusion, hallucination, is the legal test of insanity. Moral insanity is a disorder of the feelings and propensities. Legal insanity is a disorder of the intellect." In the clear and analytical charge of Sir J. HANNEN, in Boughton v. Knight, 3 L. R., Probate & Divorce, 64, 75, it is said: "It is for you to say whether the accumulation of this evidence . . . leads you to the conclusion that, whatever fluctuation

there may have been in the condition of Mr. Knight's mind, for some years before he made this will he had been subject to delusions, especially in reference to the character, the intention, and the motives of his son's acts; and if you so find, then I must impress upon you that it becomes the duty of the plaintiffs to satisfy you that at the time the testator made the will he was free from those delusions, or free from their influence. The burden of proof, as it is called, is upon those who assert that the testator was of a sound and disposing mind.''

These authorities illustrate the distinction between the two classes of mental unsoundness which in law affect testamentary capacity. The first and most common is weakness of the mind and will resulting from advancing age or physical infirmity; the other is a spontaneous conception of and belief in that which is unsupported by reason or evidence, has no existence except in the imagination, no foundation in reality and is the product of mental disease. It is contended by the contestants that the evidence in this case tends to prove that the testator was afflicted with insanity in the sense last described, at the time of the execution of his will, and that the disease manifested itself in delusions having special relation to his testamentary capacity. If this be true the case should have been submitted to the jury, and the trial court was right in so holding. If Mr. Seitz's mind was impaired, the condition was induced by himself by the excessive use of alcohol during a long period of time. This fact can, of course, have no effect upon the court with respect to the determination of his right under the law to make testamentary distribution of his property. His act stands in no more favorable position before the law than had the same condition been induced by causes independent of his own will. The effect of alcoholic madness in its relation to the enforcement of both the civil and criminal law was stated by Sir Mat-

thew Hale in his History of the Pleas of the Crown, and like many other utterances of that most eminent of English jurists it has been justified by the experience of succeeding centuries. He said (p. 32): "Although .the *simplex* phrenzy occasioned *immediately* by drunkenness excuse not in criminals, yet if by one or more such practices, an *habitual* or fixed phrenzy be caused, though this mandess was contracted by the vice and will of the party, yet this habitual and fixed phrenzy thereby caused puts the man into the same condition in relation, to crimes, as if the same were contracted involuntarily at first." It is said in the great work on Medical Jurisprudence already cited (Vol. 1, sec. 589), "Among the exciting causes of insanity alcohol takes front rank." Clouston in his Mental Diseases (p. 312) says that from fifteen to twenty per cent of the cases of mental disease may, taking the country through, be put down to alcohol as a cause, wholly or in part. These authorities tell us that the delusions attending that form of mental disease are usually persecutory or depressive in type. The subject becomes suspicious, and believes that people are in league against him. His best friends become, in his imagination, his worst enemies. He imagines even that his wife is unfaithful, and under the influence of these delusions is liable to become dangerous. The solution of the problems which must necessarily arise out of association with those so afflicted would seem to rest primarily with the medical profession, or at least with those of its members who have had special opportunity for observation and investigation along those lines. Were one of our own household so afflicted, common prudence would dictate that we consult an experienced physician with reference to the elements of safety or danger in the situation, and the court was favored with such evidence in this case. It was not necessary to rely upon strangers who were compelled to base their opinions upon hypothetical

questions founded upon the impressions of those un-skilled in the observation of such phenomena, but two such witnesses were available who had had the oppor-tunity to observe the testator for years. One of them was his intimate friend, while the other was his physi-cian, and had been in medical charge of an institution for the insane for many years. They both concurred in stating that during the time of their observation of the testator the impairment of his faculties had been continuous and progressive, and that he was not of sound mind at the time the will was made, nor for a long time before, nor afterwards up to the time of his death. The evidence tended to show that during a number of years before his death, including the time his will was made, he was subject to the very delusions which would naturally tend to disqualify him from judging of his relations to the natural objects of his bounty. He believed that his friends had become his enemies, and were trying "to do him up" or get his money. Although the will gave his daughters the bulk of his property it limited them to a life estate and provided that if they should die without heirs of their body it should go to the defendant university, with which he had no connection whatever. These two plaintiffs were his only children, to whom under the statutes of descents and distributions the entire estate would pass upon his death, and they have the right to require that the will shall be established in due form of law before it shall be permitted to operate to take away the unlimited power of disposition which would pertain to the title they would take had he died intestate. We cannot refuse them this privilege on the ground that we think the will a pretty good one and they ought therefore to be satisfied.

We think there was some evidence tending to prove a want of testamentary capacity in Mr. Seitz at the time he executed the will and it necessarily fol-

lows that the order of the circuit court granting a new trial should be affirmed and cause remanded for further proceedings in accordance with that order.

PER CURIAM.—The foregoing opinion of Brown, C., is adopted as the opinion of the court. All the judges concur.