John STURM et al., (Plaintiffs) Appellants,

v.

Dewey ROUTH, Executor, et al., (Defendants) Respondents.

No. 49778.

Supreme Court of Missouri,

Division No. 1.

Jan. 13, 1964.

Cox, Cox, Cox & Moffitt, Harvey B. Cox, William A. Moffitt, Jr., St. Louis, Breuer, Northern & Crow, Eugene E. Northern, Rolla, for plaintiffs-appellants.

Blumenfeld, Abrams & Daniel, James L. Zemelman, St. Louis, Routh & Decker, Dewey A. Routh, Rolla, for defendants-respondents.

HOLMAN, Judge.

This action was filed October 4, 1961, to contest the will of Walbridge H. Powell, deceased, which was dated April 1, 1959, and a codicil thereto dated November 6, 1959. Mr. Powell died March 21, 1961. The grounds of the contest were that Mr. Powell was of unsound mind and also that he signed said paper writings while under the undue influence of Ola V. Powell, Vera Jane Powell, and Mary P. Eyberg. Plaintiff Frances P. Sturm alone made the allegations concerning the invalidity of the will but she was joined by her husband and two children (legatees in the will) in alleging that the codicil was invalid. After a lengthy trial the jury returned a verdict upholding the will but found that the paper writing dated November 6, 1959, was "not the codicil to the last will and testament of Walbridge H. Powell." A judgment was entered accordingly.

On September 17, 1962, the trial court entered the following order and judgment: "That the verdict of jury finding codicil dated November 6, 1959 [was not the codicil] to the last will and testament dated April 1, 1959, of Walbridge H. Powell, deceased, is set aside, and defendants' motion for judgment in accordance with their motion for directed verdict at close of case sustained, and judgment rendered that said codicil is the codicil to last will and testament of Walbridge H. Powell, deceased; and further ordered that if this judgment be reversed on appeal, then defendants' motion for new trial as to said codicil is sustained and defendants granted new trial thereon. It is further ordered that this judgment is on the ground that jury verdict is not supported by substantial evidence; and in event new trial is given, same is on same ground." Plaintiffs have appealed from said judgment.

■ The sole question presented on this appeal is whether there was sufficient evidence adduced from which the jury reasonably could have found that the codicil was invalid. In considering that question we are mindful of the rule that in the situation before us we must disregard the evidence offered by defendants unless it aids plaintiffs' case, accept plaintiffs' evidence as true, and give them the benefit of every inference which may legitimately be drawn from it. McGrail v. Schmitt, Mo.Sup., 357 S.W.2d 111. Since we have concluded that there was sufficient evidence of mental incapacity to support the verdict, we need not determine the sufficiency of the evidence on the other issue. We have carefully considered all of the evidence contained in the 1,000-page transcript, but in setting out the facts herein we will omit much of the evidence offered by proponents and will endeavor to restrict our statement to favorable evidence directly bearing on the sole issue here considered, i e., the mental condition of deceased at the time the codicil was signed on November 6, 1959. It was stipulated that decedent's estate had an inventory value of $134,026. We therefore have jurisdiction of this appeal because of the amount in dispute.

The family of Walbridge H. Powell during the year 1959 consisted of his wife, Ola V. Powell, and three daughters, Mary Eyberg, Vera Jane Powell, and Frances Sturm. Another daughter, Ola V. O'Brien, had died leaving no children. At the time of trial Vera Jane was 44 years old and had been a helpless invalid since she was 17. Between the date of Mr. Powell's death and the time of trial both Ola and Vera Jane had been declared incompetent and guardians appointed for them. The widow died between the time of trial and the date the appeal in this case was taken. Mary Eyberg is the wife of Carl Eyberg and she has one son, Walbridge, by a previous marriage. Frances Sturm is married to John T. Sturm and they have two children, John P. Sturm and Jane Sturm.

Testator was 80 years old at the time the instruments in question were signed. He had been in poor health since 1951 when he suffered a severe stroke. From 1954 until his death he was confined to his home practically all of the time. During the last

several years of his life he was confined to his bed except for brief periods when permitted to sit in a wheel chair. Prior to 1951, testator was a successful business man. He was the principal stockholder in the W. H. Powell Lumber Company which operated seven or eight lumber yards in the general area in which he lived. The main office was in St. James, Missouri, where his home was located. Testator was also the principal stockholder in the Powell Ranch which was a corporation owning some 7,000 acres of land located in the same area.

John Sturm and Carl Eyberg were both engineers but eventually they became employed by Mr. Powell. It seems rather clear from the testimony that Mr. Powell did not always treat his sons-in-law with consideration and there were frequent serious disagreements and some ill feeling between them. Carl was manager of the Powell Ranch from March 1, 1945, until June 19, 1954, when he resigned because of disagreements with Mr. Powell. From 1954 until about January 1959, Mary Eyberg did not speak to or visit with her father. John Sturm was employed by the lumber company from 1946 until July 15, 1959, when he was discharged in a manner hereinafter described. In 1950 he was made general manager of the lumber company and after 1954 was also manager of the Powell Ranch.

It would serve no useful purpose to give a detailed and precise description of the contents of the will and codicil involved in this case. It is sufficient to say that in a general way the will, after providing for certain small legacies, directed that the balance of the estate be divided into two equal parts—each half to become a separate trust estate. One trust estate was for the benefit of the widow, Ola Powell, and the provision was that she would receive the income therefrom and upon her death the assets of that estate would be transferred to her estate. The other trust was for the benefit of Vera Jane, and it was provided that upon the death of Vera Jane the income would be paid to Ola if she were still alive. Upon the death of both Ola and Vera Jane, the assets of this trust estate were, in a general way, to go one half to the Sturm family, and one half to the Eyberg family. (In this connection it should also be noted that testator had previously established an inter vivos trust to provide for the care of Vera Jane.)

After John Sturm was discharged in July 1959, certain litigation arose (which will be hereinafter mentioned) and, as a result of which (at least according to the recitals therein), testator, on November 6, 1959, executed a codicil which cancelled all of the legacies to the Sturm family and provided that the assets of the trust estate heretofore mentioned be paid to Mary Eyberg and her son Walbridge.

Mildred Mooney testified that she was employed as a nurse in the Powell home for a number of years; that she was a witness to both the will and the codicil; that at times Mr. Powell could remember things, and at other times he couldn't; that his condition became progressively worse; that at times there would be screens up at the windows in his room because he would see objects on the outside, such as animals with men's heads and men with animal heads and things like that, which excited him. She testified that Mary had not visited her father and mother from 1954 to 1959 but that Frances had visited the home regularly; that in 1959 when Mary started visiting the home again Frances was not permitted to come back; that Mr. Powell was suffering from hardening of the arteries and had several light strokes while she was there; that on November 6 she was called in to witness the codicil, along with Mr. Poor and Mrs. Piper; that Mr. Powell could not hold the pen and Mrs. Piper had to hold his hand and assist him in writing his name; that at that time he was suffering from a very bad rash which "itched him terrible" and he was in an excited condition and very uncomfortable; that Mr. Powell had been given a sparine (sedative) on the day the codicil was executed and had been given such regularly prior to that time. When

this witness was asked by contestants' counsel to give an opinion as to whether testator was of sound mind at the time the codicil was executed, the court sustained an objection and did not permit her to express an opinion. However, she did testify that at the time she signed the proof of the codicil in the probate court, she did not intend to certify that he was of sound mind but just thought she was signing as a witness to the effect that he had signed the document. Mrs. Mooney further testified that testator, on many occasions, both before and after the codicil was signed, had stated that he wanted his estate divided equally between Mary and Frances. This witness also stated that after Mary started coming back to the Powell home she said that she was "out to get Bob Brinkman [Mr. Powell's attorney]" and that "she thought it was time she came in and took over."

Another witness to the will and codicil was Vivian Piper who had been employed in the Powell home as a nurse for Mr. Powell since 1954. She testified that from the first day she was in the Powell home until the day of his death Mr. Powell grew progressively worse; that once in a while Mr. Powell thought he saw a green goose when looking out the window; that when testator began talking about changing his will he didn't want to leave either Mary or Frances anything because he said they were "stinkers"; that shortly before Mary started seeing her father again she said that if somebody didn't "take ahold of things, things were going to pot and ruin"; that on November 6, 1959, and for several days prior thereto, she did not give Mr. Powell a sparine because it was causing the rash; that Mr. Powell would often cry, particularly when anyone came to see him; that at the time the codicil was signed she was of the opinion that testator was of sound mind.

Plaintiffs read in evidence the deposition of Dr. Louis F. Aitken, an M.D. of St. Louis, who was Mr. Powell's physician from time to time. Dr. Aitken testified that testator was in Barnes Hospital from November 7 (the day after the codicil was signed) until November 17, 1959; that he was debilitated with serious heart disease and was suffering from a severe skin rash which resulted from drugs, and that he was very miserable the day he arrived; that he (the doctor) was sure testator couldn't concentrate on making a will when he was in such a distressed condition; that he had a sort of temporary Parkinson's disease on that date, and had lost interest in living; that he was depressed, with some signs of senility; that after the rash disappeared and testator became comfortable, "I think he was rational enough to make a will and have sound enough mind to know what he was doing"; that on November 7 he may have been under the influence of sparine, and "I don't know what his mental state was on that day"; that after examining the hospital record he concluded that testator was rational on November 7 and knew what he was doing. When asked his opinion as to whether testator could exercise sound judgment, he stated that "when he was not under a lot of drugs, I would say that he was competent to do it, but there were some times that he was given drugs where he was incompetent." He stated further that the hospital records indicated that testator had a poor memory and that his speech was slow and hesitant. According to the testimony of Dr. Aitken testator was in Barnes Hospital in 1954, and also during two periods in 1955, as well as the period in November of 1959. In each instance his difficulties were substantially the same, beginning with high blood pressure which caused a degenerative heart condition as well as arteriosclerosis extending into the vessels of the brain. When in the hospital in February 1955 the record indicated the following: "The total picture seems to be that of a depression, reactive to retirement, complicated by senile and arteriosclerotic changes. This is probably a senile type of depression and the prognosis is not good." There is also a history of an automobile accident in late 1954 in which testator sustained seven fractured ribs and following which he became more depressed.

Harry Emory, Sr., of St. James, testified that he had been a close personal friend of testator since 1908 and visited him regularly while he was ill; that his physical and mental condition gradually grew worse; that toward the last he couldn't carry on a conversation with him because "he didn't say anything, he just cried all the time"; that finally, in the spring of 1960, he quit going to visit him because he felt that by going he would do more harm than good.

One of the employees at the Ranch, George Bell, testified that he was manager at the Ranch from November 1, 1957 to November 1, 1959; that he visited Mr. Powell a few times in his home; that he was there in September 1959 and at that time they had a conversation about a baler that had been bought for the Ranch in the spring of 1959; that testator became angry and said they did not need that baler; that he tried to explain to him that the old baler was worn out and that they had baled 45,-000 bales of hay that year, but testator still insisted that they didn't need the baler and that he wasn't going to pay for it.

Frances Sturm testified that her husband had worked with the Army Engineers for many years prior to 1946, at which time he resigned that position to take employment with her father's lumber company; that she lived in St. James and her sister Mary lived in Rolla; that during her father's illness she visited him practically every day until about March of 1959; that before he became bedfast she would often take him for a ride in the car and he referred to her as his "ray of sunshine"; that after the summer of 1958 her father would cry frequently. She stated that the Powell Ranch had a very lovely lodge house on the Meramec River but at times in the fall of 1958 her father could not remember about the lodge or the river in which they had often fished; that he couldn't remember old acquaintances or places he had known, and he thought that she had four children when she actually had only two. She testified that in March 1959 her father said to her, "Sandy [John Sturm] is steal-ing me blind"; that Mary had told him that Sandy had stolen $400,000 and that if she didn't do something, Sandy and Bob Brinkman would get the entire estate; that on July 15, 1959, Carl Eyberg appeared at a stockholders meeting of the lumber company (with Mr. Powell's proxy) and voted her and her husband off the board of directors, and that the Eybergs were elected to replace them; that that afternoon her husband was fired as manager, and three other key employees were discharged; that she went to see her father in September 1959, and again during the first part of October 1959, because she wanted him to know the truth about her husband, but she couldn't "get through to him"; that she was of the opinion that from January 1 to November 6, 1959, her father was definitely of unsound mind.

The husband of the preceding witness, John T. Sturm, testified that testator had often asked him to quit his job with the Army Engineers and go into the lumber business and that in 1946 he had done so; that in order to get him to come with the company testator had agreed to give him and Frances a retail lumber yard which "would be ours to keep," but that it would be operated as one of the units of the Powell Lumber Company; that this lumber yard was located on Highway 21 in Jefferson County and was known as the Sturmville Lumber Yard; that the real estate upon which it was located was conveyed to John and Frances Sturm; that Mr. Powell taught him the lumber business and in 1950 he became manager of the Powell Lumber Company; that from time to time testator gave the Sturms and the Eybergs shares in both the lumber company and the Ranch corporation so that each family owned the same number of shares; that in 1950 testator demanded that he and his wife convey the Sturmville Yard to him and they signed a deed to the property and delivered it to Mr. Brinkman to be held in escrow upon certain conditions; that in his opinion testator was of sound mind prior to 1958; that from 1958 until December 1959 testator

was incoherent and cried often; that in March 1959 testator, on one occasion, "looked kind of starey-eyed and all of a sudden said to him, 'you are taking $400,-000' "; that Mary had told him that. He stated that about July 1, 1958, he went to see testator and that testator ordered him to fire a Mr. Nelson who had just been hired the day before, with his approval, and when he tried to find out why he wanted him fired testator "mumbled, cried, and I couldn't get anything out of him"; that during the latter part of 1958 he received a letter from testator ordering him to reduce the wages of the men working for the company to 50¢ an hour; that they were then paying from $1.25 to $1.90 an hour; that he went to see testator and told him that "we couldn't get men to work for 50¢ an hour or 75¢ or even a dollar an hour," but testator just mumbled and cried, "he wasn't coherent and I couldn't understand him"; that he was of the opinion that on April 1, 1959, testator was of unsound mind. He stated that he had an opinion as to testator's mental competency on November 6, 1959, but the court sustained an objection to a question calling for that opinion.

Mr. Sturm further testified that at the stockholders meeting on July 15 it was stated by Mr. Routh that an audit had been made by Mr. Weigel which showed a loss by the lumber company for the first five months of the year of $24,000, but that his statement showed a profit of $33,000; that the Weigel audit was admittedly not based upon an actual inventory; that he had never stolen $400,000 or any other amount from Mr. Powell or the Powell Lumber Company or anyone else.

He stated further that in the spring of 1959 Mr. Brinkman filed an interpleader suit seeking a determination of whether testator or the Sturms were entitled to the deed to the Sturmville Yard; that after he was discharged his son, John P. Sturm, filed a minority stockholders suit against the lumber company and others; that he (the witness) mailed a copy of the petition in that suit to the Internal Revenue Service; that

said petition contained information concerning money improperly withdrawn from the Powell Lumber Company and upon which no income tax had been paid; that he did this in an effort to clear himself of any liability in that connection, although he conceded that the government had paid him an informer's award upon the money it collected; that a settlement was made of the interpleader suit and the suit filed by his son under the terms of which the Sturms surrendered 465 shares of stock in the lumber company and 155 shares of stock in the Ranch, and received in return therefor the Sturmville Yard, including its inventory and accounts.

The attorney regularly retained by Mr. Powell and the Powell Lumber Company from 1950 until March 1959 was Robert C. Brinkman of St. Louis. He also became a director of both companies in 1950. Mr. Brinkman testified that during the period heretofore mentioned he saw testator at least three times a month; that he had written various wills and codicils for him, the last such instrument being a codicil in January 1958; that until July 1, 1958, he considered testator to be of sound mind; that in the fall of 1958 testator told him he wanted to cut out of his will "both his daughters and all the family," but upon being questioned he didn't know who he would give his estate to in that event; that on that occasion he asked testator how many shares of stock he had in the lumber company and he didn't know; that testator said his salary from the companies at that time was $12,000 a year when actually it was $18,000; that he (testator) couldn't remember what was in his existing will and codicil; that after the middle of 1958 testator displayed no interest in life and often told him he wanted to die. He stated that on one occasion in the fall of 1958 testator agreed to the hiring of a Mr. Nelson as manager of the St. James Yard, but on the next visit the witness made to St. James testator denied that he agreed to it; that on another occasion he "complained to me one morning about a matter

at the Ranch"; that he went out and investigated it and when he returned that afternoon Mr. Powell had forgotten about the conversation; that at about the same time testator demanded that the men working at the Ranch be paid $1 an hour less than they were receiving and when he told testator that labor could not be obtained at that price testator said, "fire them, fire them." He stated that when he first agreed to go on the board of directors he promised Mr. Powell he would always vote for him as president of the company as long as he was physically and mentally capable of performing the duties, but that in the fall of 1958 he told Mr. and Mrs. Powell that he wanted "to be relieved of that promise"; that he couldn't "go along with it any longer" and if that wasn't satisfactory they would "have to get a different lawyer"; that he received a letter dated March 19, 1959, written by Mr. Powell's nurse, discharging him as his attorney. Mr. Brinkman also expressed the opinion that on April 1, 1959, Mr. Powell was of unsound mind.

The discharge of Mr. Brinkman was made at the suggestion of Mary Eyberg, and about that time Mr. Powell employed as his attorney Dewey Routh of Rolla, Missouri, who, the evidence indicates, was a friend of Mr. and Mrs. Eyberg. Mr. Routh prepared both the will and the codicil. Following the stockholders meeting on July 15, 1959, a meeting of the board of directors of the lumber company was held, at which Mary Eyberg was elected treasurer of the company at a salary of $5,000 a year, and Mr. Routh was elected secretary and attorney at a salary of $6,000 a year. Apparently Mr. Routh was elected a director in place of Mr. Brinkman. There was testimony to the effect that $170,000 was paid to the federal government in settlement of the tax claim against the lumber company and Mr. and Mrs. Powell for income alleged to have been withheld from tax returns during the years 1946 to 1950.

The proponents offered one physician and a number of lay witnesses who testified that in their opinion testator was of sound mind on the dates the will and codicil were executed.

In our consideration of this appeal we must bear in mind that the question is not what conclusion this court would reach upon a review of the evidence in the transcript, nor the result we may think the jury should have reached, but only whether there is *some substantial evidence* in the record from which a jury could reasonably have found that testator did not have sufficient testamentary capacity at the time he purportedly executed the codicil on November 6, 1959.

It has long been the rule in this state that "[t]o have a mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one." Bensberg v. Washington University, 251 Mo. 641, 158 S.W. 330, 336.

As indicated, we have concluded that substantial evidence was adduced which supported the verdict of the jury and hence it follows that the trial court erred in setting aside the verdict and entering a judgment "that said codicil is the codicil to the last will and testament of Walbridge H. Powell."

We have heretofore set out the evidence favorable to the verdict and it need not be repeated in our discussion of the issue presented. We will, however, briefly refer to some items of evidence which we consider

especially convincing. There was evidence that testator was under the influence of "sparine" at the time he signed the codicil. That fact becomes very important when considered in connection with Dr. Aitken's testimony to the effect that there were times when testator had been given drugs, that he was incompetent. When testator signed the codicil he was also suffering from a severe rash, was very miserable, and Dr. Aitken was sure that when he was in that condition he couldn't concentrate on making a will. It should also be noted that Frances had seen her father more often during his illness than any other witness except the nurses. After giving numerous facts upon which to base the same, she expressed the opinion that the testator was definitely of unsound mind from January 1 to November 6, 1959. We realize that she was an interested witness, but her credibility was for the jury to determine.

We are also impressed by the decided influence Mary Eyberg had with her father during the period immediately following March 1959 after she "came in and took over." While we are not deciding the issue of undue influence, we think this evidence is important in tending to show the weakened condition of testator's mind. It should be remembered that Mary had not spoken to her father for five years and he apparently made no effort to get her to adopt a more friendly attitude. Even with that background, she went to see him and almost immediately obtained the discharge of Mr. Brinkman and an attorney friendly to her and her husband was employed. There is evidence to indicate that she told her father that John Sturm had stolen $400,000 and that he believed it. That occurred, even though in the instant trial there was no evidence whatever which tended to show that John Sturm was in any manner dishonest. Nevertheless, within a few months after Mary became friendly with her father, John and Frances Sturm and Robert Brinkman were voted off the board of directors and John was discharged as manager, while Mary and Carl Eyberg, to-

gether with Mr. Routh, were elected in their stead and assumed control of the business. We think those events tend to show that testator was in a weakened mental condition.

It is also significant that on several occasions after the codicil was executed testator said he wanted his estate divided between Mary and Frances, although he should have known that Frances would receive nothing under the terms of his codicil. In a deposition taken in October 1959 (it was taken in one of the cases then pending but was read in this case) testator testified that Frances had four children, but he could give the name of only one. Since Frances and her father had both lived in the small town of St. James for years, we think it is worthy of mention that he did not know the number of children (two) that she had.

■ Evidence showing the condition of a testator before the instrument is signed is not entitled to probative value unless it raises an inference as to his condition on the date of the signing. However, in this case, all of the evidence of that nature meets the stated requirement because of the abundance of testimony that from 1954 until his death testator's condition became progressively worse. Defendants say that evidence of testator's condition on or prior to April 1, 1959, cannot be considered in connection with the issue relating to the codicil because the jury found that he was of sound mind on that date. We do not agree. Although the jury did not find that testator was of unsound mind on April 1, it could have consistently considered the evidence tending to show that he was mentally incapable on or prior to that date and could reasonably have found from that evidence and the additional evidence concerning his condition during the period from April 1 to November 6, 1959, that he lacked testamentary capacity on the latter date. In determining the issue here presented, we have considered all of the evidence which we have found reasonably raises an

inference as to testator's condition on November 6, 1959, regardless of whether it specifically related to a condition or event which existed or occurred before or after April 1, 1959. That included the opinion testimony of two lay witnesses to the effect that testator was of unsound mind on April 1, 1959.

It should be mentioned that testator was extremely depressed during the last few years of his life and would often cry, for no apparent reason, which of course indicates an abnormal mental state. Testator was president of the corporations he controlled and, according to some of the evidence, kept in close touch with the operation thereof. Nevertheless, during the period of from 12 to 15 months before the codicil was signed, he developed ideas concerning the business which were so unreasonable as to indicate that he was out of touch with reality. For example, note his demand that the wages of the men working for the lumber company (in late 1958) be reduced to 50¢ an hour. The testimony indicated that the federal minimum wage was then $1.00 an hour and the men were actually receiving $1.25 to $1.90 per hour.

The evidence of the delusions experienced by testator (seeing animals with men's heads, etc.) is not specifically applicable because there did not appear to be any relationship between the delusions and the manner in which testator disposed of his estate. However, it does tend to indicate an irrational state of mind generally and should be given some consideration.

The cases cited by each side have not been particularly helpful because, in a case of this nature, it is rare that a case can be found involving similar facts. Those cited by defendants are all distinguishable upon the facts. For example, see Glover v. Bruce, Mo.Sup., 265 S.W.2d 346, Hennings v. Hallar, 347 Mo. 827, 149 S.W.2d 338, Smith v. Fitzjohn, 354 Mo. 137, 188 S.W. 2d 832, and Huffnagle v. Pauley, Mo.Sup., 219 S.W. 373.

Plaintiffs have cited a number of cases, including Erickson v. Lundgren, Mo.Sup., 37 S.W.2d 629, Adams v. Kendrick, 321 Mo. 310, 11 S.W.2d 16, Palm v. Maguire, 347 Mo. 189, 146 S.W.2d 636, and Naylor v. McRuer, 248 Mo. 423, 154 S.W. 772. While these cases tend to support our decision in some respects, they have only limited application because the facts in each are somewhat different from those in the case before us.

For the reasons heretofore discussed the judgment is reversed and cause remanded with directions to reinstate the verdict and judgment to the effect that the paper writing dated November 6, 1959, is not the codicil to the last will and testament of testator.

All concur.